813 A.2d 280

OWENS–ILLINOIS, INC., et al.,

v.

John GIANOTTI, et ux.

ACandS, Inc.

v.

Harry Cook, Sr., et al.

No. 2644, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Oct. 30, 2002.

Reconsideration Denied Jan. 29, 2003.

Scott Patrick Burns (Gerry H. Tostanoski and Tydings & Rosenberg, LLP, on the brief), Baltimore, for Owens–Illinois, Inc.

B. Ford Davis (Gardner M. Duvall, Dwight W. Stone, II and Whiteford, Taylor & Preston, LLP, on the brief), Baltimore, for ACandS, Inc.

Edward J. Lilly (Scott Shellenberger and the Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellees.

John E. Griffith, Jr. and Piper, Marbury, Rudnick & Wolfe, LLP, on the brief, Baltimore, for amicus curiae, Maryland Defense Counsel.

Argued before SALMON, KRAUSER, SHARER, JJ.

SALMON, Judge.

This case concerns the late John Gianotti, a worker whose exposure to asbestos manufactured by appellant, Owens–Illinois, Inc. ("Owens–Illinois"), and others caused him to contract mesothelioma. Mr. Gianotti died from mesothelioma after trial but before a final judgment was entered in this matter.

Several of the important issues briefed and argued in this case were answered in a decision by the Court of Appeals in the case of *John Crane, Inc. v. James Scribner*, 369 Md. 369, 800 A.2d 727 (2002). At issue in *Scribner* was the applicability of the "cap" statute set forth in section 11–108 [1] of the Courts

---

1. Section 11–108 reads, in relevant part, as follows:

(a) *Definitions.*—In this section:

(1) "Noneconomic damages" means:

(i) In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

(ii) In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protec-

and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.). That statute limits the amount of noneconomic damages a plaintiff may recover in a personal injury case. The statute, however, is applicable only to causes of action that arise after July 1, 1986. A major issue presented below was whether Mr. Gianotti's injuries "arose"—for purposes of the "cap" statute-before July 1, 1986. The jury was asked to decide that issue, and it decided that Mr. Gianotti's injuries did arise prior to July 1, 1986. Therefore, the trial court refused to reduce the jury's award for noneconomic damages to Mr. Gianotti or the joint loss of consortium award in favor of Mr. Gianotti and his wife.

The *Scribner* Court held that, for purposes of section 11–108(b)(1), the proper manner of determining the date when a

---

tion, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article; and

(2) "Noneconomic damages" does not include punitive damages.

(3) "Primary claimant" means a person described under § 3–904(e) of this article.

(4) "Secondary claimant" means a person described under § 3–904(e) of this article.

(b) *Limitation on amount of damages established.*—(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(ii) The limitation on noneconomic damages provided under sub-paragraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3)(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.

cause of action "arises" in a case founded on exposure to asbestos is the date when the plaintiff first inhaled asbestos fibers that caused cellular changes. 369 Md. at 394, 800 A.2d 727. The medical basis for this holding was (1) inhalation of asbestos fiber causes cellular damages and (2) such damage occurs "shortly after inhalation." *Id.* at 392, 800 A.2d 727. The Court noted:

> Although the medical evidence shows that cancers take time to develop and may remain *in situ* and non-invasive for long periods of time, it has not been seriously urged, and we would not be prepared to accept it if it were urged, that an *in situ* and non-invasive cancer is not an injury; an undetectable tumor *is* an injury.

*Id.* (emphasis added).

Penultimately, the *Scribner* Court held:

> [I]n actions for personal injury founded on exposure to asbestos, the court, as an initial matter, may look, for purposes of § 11–108(b)(1), to the plaintiff's last exposure to the defendant's asbestos-containing product. If that last exposure undisputedly was before July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law. If the only exposure was undisputably after July 1, 1986, then obviously the cap applies as a matter of law. In those hopefully rare instances in which there was exposure both before and after July 1, 1986, and there is a genuine dispute over whether either exposure was sufficient to cause the kind of cellular change that led to the disease, the trier of fact will have to determine the issue based on evidence as to the nature, extent, and effect of the pre- and post-July 1, 1986 exposures.

*Id.* at 394, 800 A.2d 727.

*Scribner* overruled this Court's decision in *Anchor Packing Co. v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5 (1997), and several other cases in which we held that (1) in asbestos cases, a worker's cause of action, for purposes of the "cap" statute, arose when the plaintiff suffered an injury; (2) an "injury occurs in such cases when the inhalation of asbestos fibers

causes a legally compensable harm"; and (3) a legally cognizable "[h]arm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer." *Grimshaw,* 115 Md.App. at 160, 692 A.2d 5. Thus, under *Grimshaw,* one looks to when the disease itself first arose in the body, while under *Scribner* one looks to when the worker first inhaled the fibers that caused the damage. *Scribner,* 369 Md. at 390, 800 A.2d 727; *Grimshaw,* 115 Md.App. at 159, 692 A.2d 5.

In the case at hand, Mr. Gianotti was last exposed to asbestos in 1974. Thus, as a matter of law, the cap statute was not applicable to his case.

Although the *Scribner* decision resolves the central issue in this case, several other matters must be determined.

The Gianottis did not marry until 1986. Therefore, the following question arises: If a worker marries *after* the date of his last exposure to asbestos, but before any symptoms of his mesothelioma appear, do the worker and his spouse have a viable joint claim for loss of consortium as a consequence of the mesothelioma? The answer to that question is complicated, because in the *Grimshaw* case one of our holdings was that, for purposes of applying the cap statute, a loss of consortium claim arises at the same time as does the underlying personal injury to the spouse who inhaled the asbestos. *Grimshaw,* 115 Md.App. at 166–67, 692 A.2d 5. And, previously, we also have indicated that a marital relationship must exist at the time of the underlying personal injury in order for the spouses to later bring a joint loss of consortium action. *Gillespie–Linton v. Miles,* 58 Md.App. 484, 495, 473 A.2d 947 (1984).

Other questions presented by *Owens–Illinois* in this appeal are:

■ Did the trial court abuse its discretion in failing to grant a mistrial after plaintiffs' counsel, in closing argument, mentioned the "cap" statute?

■ Did the trial judge misinterpret the meaning of the release signed by John Gianotti and his wife on July 8, 1994?

The Gianottis present the following question in their cross-appeal:

■ Did the trial court err in reducing judgments in their favor under the UCATA [Maryland Uniform Contribution Among Tortfeasors Act] based upon a previous default judgment entered against third-party defendant, Babcock and Wilcox ("B & W")?

## I. *PROCEDURAL BACKGROUND*

Five asbestos-related personal injury claims were tried jointly in the Circuit Court for Baltimore City. The plaintiffs were John Gianotti and his wife, Shirley, along with the personal representatives and widows of Harry Cook, Sr.; Aristide Nardone; Donald R. Schrader; and George E. Worthen. In each case the actions were brought against numerous defendants, including Owens–Illinois and ACandS, Inc. The plaintiffs claimed damages for the development of mesothelioma, which resulted from asbestos exposure. At the time the cases were submitted to the jury, ACandS was defending all five cases, but Owens–Illinois was defending only the *Gianotti* case.

The jury returned verdicts against Owens–Illinois and ACandS in the *Gianotti* case, awarding Mr. Gianotti $5,500,000 in damages, and Mr. and Mrs. Gianotti $1,000,000 (jointly) for loss of consortium. Judgments were also entered against ACandS in the four other cases.

As a result of post-trial proceedings, the court entered judgments on November 1, 2000. The judgments in favor of the Gianottis were reduced by the *pro rata* releases of adjudicated joint tort-feasors, and a default judgment against Babcock and Wilcox Company, a third-party defendant in the *Gianotti* case. Reductions were also made pursuant to confirmed plans of reorganization of several bankrupt defendants. In pertinent part, the court ultimately entered judgments as follows:

*Gianotti Case as to ACandS and Owens–Illinois Jointly*
$1,050,499.71     John Gianotti
  175,653.74     John & Shirley Gianotti for loss of consortium

Post-judgment motions were filed by ACandS and Owens–Illinois. Those motions included ACandS's and Owens–Illinois's motions for JNOV and for a partial new trial, which were denied on January 9, 2001. Appeals were filed by ACandS and Owens–Illinois. A timely cross-appeal was then filed by the plaintiffs in the *Cook, Nardone,* and *Gianotti* cases. Subsequent to oral argument before us, ACandS settled with the plaintiffs and dismissed its appeal.

## II.  *ISSUES RESOLVED BY THE SCRIBNER DECISION*

Owens–Illinois contends that the trial judge erred by denying their motions for judgment as to the cap issue, as well as their later post-trial motions. According to Owens–Illinois, those motions should have been granted because (a) the Gianottis failed to prove that their claims "arose" before July 1, 1986, and (b) the court wrongfully allowed counsel for the Gianottis to introduce expert testimony and to argue to the jury that the Gianottis' injuries "arose" prior to July 1, 1986.

The law applicable to appeals is that existing at the time the case is decided. *See American Trucking Associations, Inc. v. Goldstein,* 312 Md. 583, 591, 541 A.2d 955 (1988). The brief of Owens–Illinois, as well as the amicus brief filed by the Maryland Defense Council, Inc., were well-researched and their arguments were persuasively presented. Unfortunately, those briefs were filed several months before June 13, 2002—the date the *Scribner* case was decided.

Although the jury in the case at hand decided that Mr. Gianotti was injured prior to July 1, 1986, it was unnecessary for the jury to even consider that issue because it was undisputed that the last date of asbestos exposure of Mr. Gianotti was before July 1, 1986. Applying the dictates of the *Scribner* case to the facts of this case, the plaintiffs met their burden of proof as to the cap issue. No evidentiary ruling

concerning expert testimony as it related to the issue of when the worker's injury arose could possibly have prejudiced Owens–Illinois because, under *Scribner*, the cap statute was inapplicable as a matter of law. *See Bradley v. Hazard Technology Co.*, 340 Md. 202, 206, 665 A.2d 1050 (1995) (explaining that to succeed on appeal, the appellant must show not only error but must show, as well, that prejudice resulted from that error.)

## III.

### Did the Trial Court Abuse Its Discretion in Denying Owens–Illinois's Motion for Mistrial?

Section 11–108(d) of the Courts and Judicial Proceedings Article, which is a part of the cap statute, provides that "the jury may not be informed of the limitation [on noneconomic damages] imposed by subsection (b)" of section 11–108.

After a two and one-half week trial, counsel for the Gianottis, in closing argument, made the following remarks:

Ask yourselves if he [expert called by the defendants] is qualified, first of all, to render that opinion, and if he can render the opinion without knowing something about when the disease occurred in these fellows' cases.

And by that I mean when it was diagnosed and when the symptoms first appeared. He didn't know any of that, but the opinion was still offered.

*Now, the testimony about the cap, about the 1986 date—*

(Emphasis added.)

Immediately after the mention of the word "cap," counsel for Owens–Illinois, Ms. Tostanoski, objected. Counsel then approached the bench and the following exchange occurred:

THE COURT: You can't mention that.

MR. FLERLAGE [PLAINTIFFS' COUNSEL]: I know.

MS. TOSTANOSKI: Your Honor, I move for mistrial. I am serious.

MR. FLERLAGE: I think that can be cured with an instruction, if you think it is necessary at all, because they don't know what a cap is.

MS. TOSTANOSKI: Of course, they know what a cap is. Of course, they know. There are salary caps on sports teams, and there is no way they don't know what a cap is, Judge.

What they don't know is that they have no idea why they are making this decision. Mr. Flerlage is telling them they are making a finding of fact for Your Honor to make a decision, and now he had told them about a cap.

It is prejudicial. There is no way that can be corrected.

\* \* \*

MS. TOSTANOSKI: The statute is clear that a jury can never be told about that.

THE COURT: Well, it wasn't told about it.

MS. TOSTANOSKI: Of course, they were.

MR. FLERLAGE: I don't think it does any good at this point to highlight whatever the jury does perceive from that.

THE COURT: Such an experienced lawyer. I am not going to rule on it. I am going to hold [*sub curia*] the motion for mistrial.

The next morning, after deliberations had begun, the jury sent the trial judge a note that read: "Is [sic] are there any caps as to the amounts given by law?" The court answered: "That is no concern. You do not even consider, deliberate, or talk about whether there is or is not a cap. Okay?"

Post trial, Owens–Illinois moved for a partial new trial concerning the application of the damage cap because of plaintiffs' counsel's "violation" of the cap statute. Owens–Illinois, alternatively, asked the trial court to grant the mistrial, which it had held *sub curia*. The trial judge denied the motions. Among his reasons for doing so were the following:

The trial was two and a half weeks, and at the end of the entire trial, at the end, really, almost of the closing argument, ... counsel said one word, "cap." Now, it's interesting, and I'm glad that counsel did play back the tape, because when you listen to that, you really saw two things.

I have been convinced that one is, it was almost difficult to hear what it was that Mr. Flerlage said. The second thing, and more importantly, is it's clear he misspoke. It was clearly a blurt on his part. And I add to that, I put into the equation when I make that statement, I guess you got to know the people you're dealing with.

I've said this before to all of you. I think that the lawyers, by and large, who are involved in the asbestos litigation are really some of the best litigators at the Maryland bar, and Mr. Flerlage was the one who took part in the case before me that went for some nine months, and during that period of time, he's certainly a hard litigator, and wants to represent his side well, but he never did anything unethical or improper during that period of time. And during that long case, whenever I set a ground rule, he followed what I said.

So I say all of that, because if I thought that a lawyer had deliberately said "cap" to gain some edge, I wouldn't hesitate in granting the defense motion, but I'm convinced that that was not the case.

I am convinced that that did not deprive the defense, the defendants, of a fair trial in this case, and I think it is significant how the jury acted with regard to the cross-claim, because frankly, after that argument the plaintiffs made to the jury, I almost thought they were going to come back and find that none of the cross-defendants were negligent, but they didn't. They found what—they followed the instructions, and I have to assume that they also followed the instruction that I gave them, to not pay attention to the cap. They're not just following my instructions on one item and not on another item.

I think that, in sum, that one word did not deprive the defendants of a fair trial, and I think that the jury did follow the instructions that I gave them.

Owens–Illinois now argues that "[b]ecause counsel violated § 11–108(d)(1), the trial court committed reversible error in denying [d]efendants' motion for mistrial and for partial new trial." We will first address the issue of whether Owens–Illinois is entitled to a partial new trial.

In light of the Court's holding in *Scribner, supra,* it is clear that appellant was not entitled to a partial new trial on the cap issue. Under the rule established in *Scribner,* trial as to the cap issue was not warranted in the first place. The issue of whether a mistrial should have been granted, however, presents a somewhat more complex issue.

We note at the outset that appellant is technically inaccurate when it claims that appellees' counsel "violated section 11–108(d)(1)." That subsection only prohibits the jury from being told the various limits on noneconomic damage recovery set forth in section 11–108(b). This distinction was recognized by the trial judge in the discussion at the bench immediately after the word "cap" was used in closing argument. Nevertheless, as the trial judge recognized, the jury should not have considered, in any way, whether Maryland had a cap on damages, and counsel for the Gianottis should not have mentioned the cap statute at all in his closing argument. The question then becomes whether the remark of plaintiffs' counsel denied Owens–Illinois a fair trial.

Owens–Illinois argues:

The jury's concern about legal limits on damages could have harmed [d]efendants in two ways. First, the jury could have inflated the award to assure that any upper limit on recovery was met. Second, it could have exercised its factfinding role to subvert the legislative policy of limiting awards. Given the statutory prohibition of letting a jury consider either of those questions, the fact that this jury considered those matters is sufficient to make the denial of the mistrial reversible.

Because counsel violated § 11–108(d)(1), the trial court committed reversible error in denying [d]efendants' motions for mistrial and for partial new trial. . . .

We disagree with appellant's assertion that if a juror knows that there is a statutory cap on damages, but does not know the amount of the cap, then the juror would likely inflate the verdict to be sure that "the upper limits" of recovery are met. We can see no reason why a juror would agree to a damage figure higher than what he or she thinks is deserved for the purpose of insuring that the amount awarded is the most that is statutorily allowable.

We interpret Owens–Illinois's argument that knowledge that the statutory cap exists might encourage one or more jurors to exercise its fact-finding role "to subvert the legislative policy of limiting awards" to mean that it contends that if a juror knew that the cap was inapplicable to injuries that arose prior to July 1, 1986, this would encourage jurors to "subvert" the legislative intent to limit noneconomic damage awards by finding that the injury did arise before the effective date of the statute. If a juror were to combine what plaintiffs' counsel said about the "cap" with the fact that plaintiffs' counsel argued so vigorously that the injury arose prior to July 1, 1986, it is entirely possible that one or more jurors might infer that no cap would apply if the jurors determine that the worker's injuries occurred prior to July 1, 1986. Therefore, we agree with Owens–Illinois that if the jury disregarded the court's instruction it is possible that the mention of the "cap" may have influenced the jurors' vote concerning the issue of whether the injury occurred before or after July 1, 1986. But even if *that* vote was affected, the appellant was not unfairly prejudiced because, applying *Scribner*, the cap statute was inapplicable as a matter of law.

The major danger that is present when a juror in a personal injury case knows that there is a statutory limit on noneconomic damages is that a juror, who does not agree with a fellow juror's inflated estimate of damages, might nevertheless acquiesce in what he or she believes is an excessive verdict

based on the belief that the verdict will be reduced by a statutory cap. That danger, however, is much less in a case like this one in which the jury was not told of the amount of the cap. Moreover, in this case, the trial judge's answers to the jury note, if the jury obeyed it, completely eliminated that potential source of prejudice.

Owens–Illinois argues that the type of prejudice involved in this case simply could not be erased by a curative instruction. According to appellant, the subject case is closely analogous to that of *Morris v. Weddington*, 320 Md. 674, 579 A.2d 762 (1990). In *Morris*, a child of three was injured when he was struck by a van driven by William Weddington. *Id.* at 675, 579 A.2d 762. The child required surgery and subsequent medical treatment, and his leg was required to be kept in a cast for a total of twelve weeks. *Id.* The child's mother sued Weddington individually and on behalf of her child for negligence in operating the van. *Id.* At trial, one of Weddington's key witnesses, in reply to a question by defense counsel, said that he had been told that Weddington "did not have insurance." *Id.* at 676, 579 A.2d 762. Plaintiff's counsel moved for a mistrial, but the motion was denied. *Id.*

Later in the trial, a juror submitted a written question to the court, which read:

> [T]he plaintiff's attorney made reference to the possible fact that the defendant was not insured to drive the van. I remember that this question was not allowed. I think if this fact ends up having bearing on our damages judgment, perhaps we should check the court record to be sure about this fact; that is, is the question admissible or not.

*Id.* at 677, 579 A.2d 762.

The trial judge brought the juror who had written the note, along with the foreman who had read it, into his chambers and told the two that whether or not Weddington had insurance (or other assets) had "no bearing on the issues in this case." *Id.*

Despite the court's admonition, the jury thereafter propounded three additional questions relating to insurance coverage, *viz:*

(1) whether a health insurance carrier had paid any portion of [the child's] medical expenses, (2) whether, if the jury found Weddington negligent, the insurance company would be able to recover its payment from him, and (3) whether [the child's mother] must reimburse the insurance carrier for any medical expenses awarded her.

*Id.* at 677, 579 A.2d 762.

The trial judge responded to the questions by telling the jurors:

None of the questions asked by you are issues in this case. You are only to decide whether or not the defendant was or was not negligent. If he was negligent, then you are to decide what, if any, damages [the child's mother] sustained and what, if any, damages the minor child sustained.

*Id.* at 677–78, 579 A.2d 762.

The jury returned a verdict in which it awarded the child's mother $7,033.45 for the medical expenses incurred as a result of the accident but awarded no damages to the minor child. *Id.* at 678, 579 A.2d 762. After the judge instructed the jury that if they found for the child, they must award him at least one dollar in damages, the jury retired and returned a verdict in favor of the child in the amount of $1,000, together with an award in favor of his mother in the same amount as previously announced. *Id.*

In *Morris,* the Court of Appeals held that the trial judge committed reversible error in failing to grant a mistrial based on the witness's statement that he had heard that Weddington was uninsured. *Id.* at 681–82, 579 A.2d 762. The Court explained that the evil inherent in hearing such testimony is that, if the jury believes that insurance coverage is nonexistent, it may limit the award to what it believes the defendant can personally afford regardless of the actual damages proved. *Id.* at 681, 579 A.2d 762 (citing McCormick *Evidence* § 201 (3d ed. 1984)). In setting forth its reasons for

reversal, the Court stressed the fact that the verdict was well below the damages amount established by the plaintiffs. Moreover, it was clear to the Court from the questions that were later asked by the jury "that insurance, or the lack thereof, was a primary factor in the jury's consideration of the award." *Id.*

In the case at hand, appellant asserts that *Morris* is on point because, during deliberations, the jury sent the judge a note concerning the cap. There is no way to know with absolute certainty whether the jury note was precipitated by appellees' counsel's mention of the cap. There is, however, at least a substantial possibility that the jury note was unconnected with the improper remark by counsel. This is made evident by the following colloquy, which took place immediately after the note was received:

MS. TOSTANOSKI [COUNSEL FOR OWENS–ILLINOIS]: Judge, I think what could be happening is, I don't know whether Your Honor is aware, but today in Annapolis is the hearing on the repeal of the cap, and I think it has gotten some publicity.

THE COURT: I didn't see anything. I read the morning paper. Did anybody see anything?

MR. SHELLENBERGER [ANOTHER OF PLAINTIFFS' COUNSEL]: No.

MS. TOSTANOSKI: It was in the Daily Record, the Baltimore Business Journal. I think it was on WBAL radio this morning.

I have somebody checking all the websites, but there is a hearing today, and that was one of my major concerns about it.

THE COURT: The answer is, of course, it is no concern of theirs. They are not even supposed to consider that.

Immediately after this dialogue, the trial judge told the jury not to consider whether a "cap" existed.

There is a presumption that jurors understand and follow the court's instructions. *Ezenwa v. State,* 82 Md.App. 489, 518, 572 A.2d 1101 (1990). More specifically,

> [w]hen curative instructions are given, it is generally presumed that the jury can and will follow them. *Brooks v. State,* 68 Md.App. 604, 613, 515 A.2d 225 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987). Furthermore, the trial judge is in the best position to determine whether his instruction achieved the desired curative effect on the jury. *Myers v. State,* 58 Md.App. 211, 228–29, 472 A.2d 1027, *cert. denied,* 300 Md. 484, 479 A.2d 373 (1984).

*Carter v. State,* 80 Md.App. 686, 691, 566 A.2d 131 (1989).

In *Morris,* there was evidence that the jury did not follow the judge's curative instruction. In the words of the *Morris* Court, the amount of damages awarded tended "to demonstrate the influence that the issue of insurance had on the jury." *Id.* at 681, 579 A.2d 762. Moreover, the fact that persons on the *Morris* jury repeatedly wrote notes concerning insurance, reasonably could be interpreted as indicating that the court's instruction may not have had its intended effect. By contrast, in the instant case, there was only one note from the jury concerning the issue of the "cap," and as Owens–Illinois's counsel said at trial, that note may have been generated by media discussion of the cap statute rather than by what plaintiffs' counsel said in closing argument.

*Morris* is one of the few reported cases in this State where an appellate court has held that the trial court abused its discretion in denying a motion for mistrial. "[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990). A trial judge is given broad discretion in determining whether a motion for mistrial should be granted. *Vandegrift v. State,* 82 Md.App. 617, 635, 573 A.2d 56 (1990). "The most significant guideline for the exercise of the trial judge's discretion is that a mistrial is to be declared only where it is 'manifestly necessary,' or 'under urgent circumstances,' or 'only in very extraordinary

and striking circumstances,' and declaring a mistrial is not 'to be lightly undertaken.' " *Cornish v. State,* 272 Md. 312, 318, 322 A.2d 880 (1974) (quoting *United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824)).

The core reason for granting such broad discretion to the trial judge in this area is that the judge, who hears the entire case, can best weigh the danger of prejudice arising from improper conduct by counsel or witnesses. And the trial judge is in a far better position than an appellate court "to determine if the extraordinary remedy of a mistrial is appropriate." *Hunt,* 321 Md. at 422, 583 A.2d 218. Put another way,

The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

*State v. Hawkins,* 326 Md. 270, 278, 604 A.2d 489 (1992). In reviewing the exercise of this discretion, "the trial judge's decision denying a mistrial will not be disturbed on appeal unless there has been a clear showing of prejudice to defendant." *Vandegrift,* 82 Md.App. at 635, 573 A.2d 56. *See also Hunt,* 321 Md. at 422, 583 A.2d 218 (citing *Johnson v. State,* 303 Md. 487, 516, 495 A.2d 1 (1985)).

We discussed what constitutes an abuse of discretion in *Das v. Das,* 133 Md.App. 1, 754 A.2d 441 (2000):

Abuse of discretion occurs

"where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling

is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice." We will not reverse a ruling we review under the abuse of discretion standard simply because we would have made a different ruling had we been sitting as trial judges. Instead, "[t]he real question is whether justice has not been done," and the judgment will be reversed only if "there is a grave reason for doing so."

*Id.* at 15–16, 754 A.2d 441 (citations omitted).

Owens–Illinois has failed to meet its burden of showing that a mistrial was "manifestly necessary" or that due to counsel's remarks "urgent circumstances" existed that required the grant of a mistrial. *Cornish,* 272 Md. at 318, 322 A.2d 880. Here, the trial judge did not believe that the defendants suffered prejudice.

## IV. *THE RELEASE SIGNED BY JOHN AND SHIRLEY GIANOTTI ON JULY 8, 1994*

John Gianotti was last exposed to asbestos in 1974, when he was 32 years old. Mr. Gianotti was diagnosed as having an asbestos lung disease (asbestosis) in August 1985. On June 12, 1986, the Gianottis married. The Gianottis, in 1987, filed suit in the Circuit Court for Baltimore City against Owens–Illinois and many other defendants. Owens–Illinois reached a settlement with the Gianottis, and on July 8, 1994, the Gianottis executed a document entitled "Release and Settlement of Claim" ("Release"), in which the Gianottis released Owens Illinois from the "claim that JOHN GIANOTTI [h]as contracted the disease known as asbestosis, ..." The Release continues,

It is the specific intent of this release to release and discharge [Owens–Illinois] for any and all further claims relating to the matters for which recovery was sought in the Circuit Court for Baltimore County, Case Number 87CG3549/45/19, including any and all claims made in the Complaint, Answers to Interrogatories, depositions, reports of medical experts prepared at the request of me/us and/or my/our attorneys, and opinions rendered concerning the

medical condition of JOHN GIANOTTI by experts retained by me/us and/or my/our attorneys, regardless of the future progression or course of the medical conditions alleged to exist therein, including death resulting from that/those conditions (all such claims are hereafter referred to as the "existing lawsuit").

As can be seen, under the just-quoted portion of the Release, Mr. and Mrs. Gianotti released Owens–Illinois from any claims for personal injury, loss of consortium and/or death resulting from "asbestos lung disease" and/or "asbestos-related disease."

Notwithstanding the aforementioned broad language, the Release goes on to restrict the terms of the general release provision by providing:

It is not the intent of this release, and I/we specifically *do not release* claims for cancer, *mesothelioma* and or other malignancies or death resulting from cancer, mesothelioma or other malignancies not alleged or described in the existing lawsuit allegedly resulting or to result from JOHN GIANOTTI's exposure to asbestos (*hereinafter described as "future disease "*).

(Emphasis added.)

Later in the Release, the parties agreed that Owens–Illinois retained the right to defend itself against claims for "any future disease that may occur." That part of the Release was worded as follows:

[Owens–Illinois], by making payment herein and agreeing to the form and content of this Release, [is] likewise not admitting or conceding any liability for *any future disease that may occur,* nor [is it] estopped in the future on any grounds to contest [its] liability therefore, and neither settlement, payment nor existence of this Release may be used against [Owens–Illinois] in any way to attempt to prove liability or fault *for any future disease.*

(Emphasis added.)

In March 1999, nearly thirteen years after signing the Release, Mr. Gianotti was first diagnosed with mesothelioma. Owens–Illinois, relying on the language in the Release, argues:

A mesothelioma that is a "future disease" is, by definition, one that has not yet "com[e] into being." And if the parties agreed that Mr. Gianotti's mesothelioma had not "come into being" as of July 8, 1994, then [p]laintiffs' personal injury and loss of consortium causes of action for mesothelioma arose or came into being after July 1, 1986, and any personal injury/loss of consortium damages recoverable from that mesothelioma are therefore subject to the cap [statute].

The validity of this argument is based on the premise that the parties agreed in the Release that Mr. Gianotti's mesothelioma had not "come into being" as of July 8, 1994. We reject that premise-as did the trial judge. It is clear that, when the parties to the Release used the parenthetical phrase "hereinafter described as 'future disease,' '' they used it simply as shorthand to denote what claims that were not being released. Three categories of claims were not being released, *viz*, claims for "(1) cancer, (2) mesothelioma, (3) other malignancies or death resulting from cancer, mesothelioma, or other malignancies not alleged or described in the existing law suit ... resulting or to result from John Gianotti's exposure to asbestos." Appellees' present claims come within the second category. We therefore are in full accord with the following argument made by appellees, *viz:*

The term "future disease" was simply language of convenience designated by [Owens–Illinois] to identify the reservation of any mesothelioma claim. It is obvious that [Owens–Illinois] could have selected any word to be a proxy for the wording of the reservation including "cancer claim," "reserved claim," etc. The fact that the word "future" was used could not and did not negate the right of Mr. Gianotti to proceed upon a mesothelioma cause of action in the future.[2]

As an alternative argument, Owens–Illinois says:

---

2. In their respective briefs, both appellant and appellees maintain that the language used in the Release is clear and unambiguous. As is often

If this Court refuses to uphold the parties' agreement that Mr. Gianotti's mesothelioma was a future disease as of the date the Release was signed, then [p]laintiffs release[d] their mesothelioma claim against Owens–Illinois. This is because the Release is a general release that releases all claims for which recovery was sought in ... [the subject case].

Owens–Illinois goes on to argue that "the only exception to this general release language concerns a 'future disease.' " According to Owens–Illinois, if we decide that the parties did not agree that Mr. Gianotti's mesothelioma was a "future disease" then that disease was released. Our answer to that contention is similar to our earlier one. Under a plain reading of the Release, the term "future disease" was used as merely a shorthand to describe three separate categories of claims that were not being released. And one of the categories of claims that was *not* being released was a claim for mesothelioma. The trial court did not err in its interpretation of the Gianotti Release.

## V. *THE GIANOTTIS LOSS OF CONSORTIUM CLAIM*

As noted earlier, the Gianottis were married about two weeks before the cap statute became effective. They married approximately one year after Mr. Gianotti was diagnosed with asbestosis and approximately twelve years after he was last exposed to asbestos fibers. Mr. Gianotti first experienced symptoms associated with mesothelioma almost thirteen years after his marriage.

In *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423 (1995), the Court held that a loss of consortium claim by the marital unit was derivative of the personal injury claim of the physically injured spouse. *Id.* at 38, 660 A.2d 423. The Court held in *Owens–Illinois v. Armstrong*, 326 Md. 107, 604 A.2d 47 (1992), that a cause of action *arises* for purposes of the cap statute

the case when both parties reach such an agreement, they nevertheless dispute the meaning of the contractual term at issue.

"when facts exist to support each element" of the cause of action, with the fact of injury being the last element to come into existence. *Id.* at 121, 604 A.2d 47. The *Armstrong* Court defined the injury element as requiring legally compensable harm that would form a basis of recovery by a plaintiff. And, as the Court of Appeals held in *Scribner,* a cell change, which occurs shortly after inhalation of asbestos and ultimately causes mesothelioma, is a compensable injury.

In *Grimshaw, supra,* we affirmed the circuit court's judgment that the cap statute was inapplicable because the workers who inhaled asbestos were injured before July 1, 1986. The question next addressed was when did the claim for loss of consortium arise—for purposes of applying the cap statute. The *Grimshaw* Court said:

> In the case at bar, each plaintiff exposed to asbestos suffered personal injury when he or she developed mesothelioma, which was prior to 1986. It is true, however, that some of the harm plaintiffs suffered as a result of those personal injuries, *i.e.,* loss of consortium, did not occur until after the effective date of the statute . . . .
>
> Although plaintiffs continued to suffer damages, as a result of their personal injuries, after the effective date of the statute, as in *Oaks,* the cause of action arose prior to the effective date. *Oxtoby,* 294 Md. at 97, 447 A.2d 860 (the fact that some of the monetary compensation sought was for harm arising after the effective date, did not make the statute applicable when the cause of action arose prior to the effective date); *see also Johns Hopkins Hospital v. Lehninger,* 48 Md.App. 549, 429 A.2d 538 (1981); *Dennis v. Blanchfield,* 48 Md.App. 325, 428 A.2d 80 (1981), *modified,* 292 Md. 319, 438 A.2d 1330 (1982) (both these cases stand for the proposition that a medical injury occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date).
>
> Therefore, we conclude that appellees' claims for damages resulting from their personal injuries, including damages for loss of consortium, arose prior to the effective date of the

statute and, therefore, are not subject to the statutory cap. . . .

*Grimshaw*, 115 Md.App. at 166–67, 692 A.2d 5.

Thus, under the *Grimshaw* holding, a cause of action for loss of consortium (for purposes of the cap statute) arises at the same time as does the worker's personal injury action.[3]

---

3. The *Grimshaw* decision, insofar as it concerns the loss of consortium claims, was criticized in an article by M. King Hill, III, and Katherine D. Williams, *State Laws Limiting Liability for Noneconomic Damages: How Courts Have Dealt with the Related Legal and Medical Issues in Asbestos Personal Injury Cases*, 27 U. Balt. L.Rev. 317, 346–48 (1998):

> Apparently, the Grimshaw Court based its holding on the implicit notion that loss of consortium damages constitute merely a part of the harm arising from the spouse's physical injuries; thus, for purposes of applying the cap statute, the physical injury constituted the only injury that was applicable to determining when the cause of action arose.
>
> The court did not, however, explicitly address the question of whether, in determining the applicability of the cap statute, the injury to the marital unit and the spouse's personal injury are one injury or two separate injuries. Although a loss of consortium claim derives from the initial injury to the spouse, it clearly represents an injury separate from that suffered by the injured spouse. It is an injury to the marital unit. To conclude that loss of consortium is the same injury, in the sense that all the elements of a cause of action for loss of consortium are present when the elements of the cause of action based on the personal injury claim are met, does not reflect factual reality. The loss of consortium—the "loss of society, affection, assistance, and conjugal fellowship"—does not occur when the first cancer cell forms in the injured spouse's body, even though that cancer may be the injury that results in the ultimate death. Generally, a plaintiff's loss of consortium would not occur until well after the spouse's first symptom, when the injury prevents the spouse from doing what he or she used to be able to do, thus, adversely affecting the marital relationship. Analogous to a loss of consortium claim is a cause of action for wrongful death, which arises upon the death of the injured spouse, and not when the first cancerous cell forms in the spouse's body. It would be logical to conclude, therefore, that a cause of action for loss of consortium can only arise when the marital unit experiences some injury.
>
> The problem inherent in the Grimshaw Court's holding becomes clear when one contemplates the following situation. A worker is exposed to asbestos between 1955 and 1978. He marries in 1990. He experiences his first symptoms in 1994, becomes ill, and dies the same year. After his death, his estate and his widow bring survival and wrongful death actions against various asbestos manufacturers. The court finds that his injury developed before 1986, his cause of

And, for purposes of the cap statute, Mr. Gianotti's cause of action for mesothelioma "arose" (as opposed to "accrued") about twelve years before he married Shirley Gianotti.

In *Gillespie–Linton v. Miles,* 58 Md.App. at 496, 473 A.2d 947, we said:

> [W]e agree with the reasoning of the Supreme Judicial Court of Maine in *Sawyer v. Bailey,* 413 A.2d 165, 167 (Me.1980) (citations omitted):
>
> The general rule is that no person has a right of action against a wrongdoer, unless that person is personally injured. *The cause of action accrues, generally, when the tort is committed. ... When the alleged antenuptial tort was committed by the defendant against the woman plaintiff, the man plaintiff suffered no injury, because he possessed no marital right at that time, never having assumed any marital obligations.* When Daniel Sawyer later took Lynn Jackson as his lawful wedded wife, he took her for better or for worse in her then existing health, voluntarily taking into himself any marital deprivation that might result from his wife's premarital injury.

(Emphasis added.) *See also Rockstroh v. A.H. Robins Co.,* 602 F.Supp. 1259, 1269 (D.Md.1985) ("It appears to be universally held that, in order to maintain a valid cause of action for loss of consortium, the parties must be married at the time of

---

action therefore arose before 1986, and accordingly, the limitation on noneconomic damages is inapplicable. The court further concludes that, under Grimshaw, the widow's cause of action for loss of consortium arose before 1986, even though the couple did not marry until 1990, and he did not experience any symptoms until 1994.

Applying the Grimshaw test to the hypothetical loss of consortium claim highlights the test's illogical premise and inherent unworkability. As noted above, applying the Grimshaw Court's analysis of the cap statute in the context of a personal injury claim demonstrates that in many cases, a cause of action may arise years before a single item of damages has been incurred. Likewise, in the context of a loss of consortium claim, under the Grimshaw interpretation, a cause of action may be deemed to have arisen years before the first injury to the relationship. In some cases, the cause of action for loss of consortium could be deemed to have occurred even before the marriage took place.

injury."). Charles Plovanich, in his Annotation, *Recovery for Loss of Consortium for Injury Occurring Prior to Marriage,* 5 A.L.R.4th 300, 301 (1981), sums up the rule as follows:

> In general, courts have denied recovery for loss of consortium where the injury occurs before the marriage. Frequently observing that the right of consortium grows out of the marital relationship, these courts have refused to allow recovery for loss of consortium on the ground that the respective spouses were not married at the time of the injury.

No Maryland appellate case has decided the issue of whether the general rule (that no loss of consortium claim exists for an ante-nuptial tort) applies in cases where, at the time of the marriage, the injury to the spouse is latent and therefore has not been, and could not have been, reasonably discovered prior to the marriage.

In the case of *Consorti v. Owens–Corning Fiberglas,* 86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301 (1995), the New York Court of Appeals answered a certified question from the U.S. Court of Appeals for the Second Circuit, *viz:* "Whether a cause of action lies for loss of consortium where, prior to the marriage, the plaintiff spouse was exposed to, and ingested, a substance that remained in his body and eventually caused illness, but the illness did not occur until after the marriage." *Id.* at 18, 657 N.E.2d at 1301. The applicable rule in New York, according to the *Consorti* decision, was that for statute of limitations purposes, a cause of action accrues upon the introduction of the toxic substance into the body, *i.e.,* prior to the discovery of the injury. *Id.* at 18, 657 N.E.2d at 1302–03.[4]

---

4. The accuracy of that statement in the *Consorti* decision appears to be questionable, at least based on our reading of a statute passed by the New York legislature in 1986 approximately nine years prior to the *Consorti* decision. *See* N.Y. C.P.L.R. 214–c (McKinney 1986). In *Blanco v. American Telephone & Telegraph Co.,* 90 N.Y.2d 757, 666 N.Y.S.2d 536, 689 N.E.2d 506, 509 (1997), the New York Supreme Court appears to agree that C.P.L.R. 214–c abrogates the exposure rule in toxic tort cases. The Court said:

The injured worker in *Consorti* was exposed to asbestos between 1960 and 1970; he married in 1976 and was diagnosed with mesothelioma in 1992. *Id.* at 18, 657 N.E.2d at 1301. The New York Court of Appeals answered the certified question in the negative. *Id.* at 18, 657 N.E.2d at 1303. Its reasoning was:

> Even more to the point for purposes of the instant case, in *Matter of Steinhardt v. Johns–Manville Corp.* (54 N.Y.2d 1008 [446 N.Y.S.2d 244, 430 N.E.2d 1297], *remittitur amended* 55 N.Y.2d 802 [447 N.Y.S.2d 437, 432 N.E.2d 139], *appeal dismissed and cert. denied,* 456 U.S. 967 [102 S.Ct. 2226, 72 L.Ed.2d 840]), this Court affirmed summary judgment dismissing as time-barred the cause of action for a plaintiff's mesothelioma, caused by earlier inhalation of asbestos, the same etiology on which Mrs. Consorti's loss of consortium is based. In doing so, the Court found irrelevant plaintiff's medical proof which is indistinguishable from that relied upon here by the District Court to sustain Mrs. Consorti's loss of consortium claim: "that the properties of particles of asbestos are such that their inhalation will not necessarily result in the contraction of the disease; ... that, even if a cancerous tumor later forms, it will not have begun to do so at the time of exposure; that, before such an event will occur the asbestos may lay dormant for years" (*id.*, at 1013[, 446 N.Y.S.2d 244, 430 N.E.2d 1297] [Fuchberg, J.,

---

At the outset, we agree with the Appellate Division that CPLR 214–c is inapplicable in this case. CPLR 214 c was enacted in 1986 as part of a larger "tort reform" package (L 1986, ch 682), and provides that "the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances ... must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." (CPLR 214–c[2].) *CPLR 214–c was enacted to abrogate the exposure rule which this Court had formulated and adhered to in a line of cases stretching from Schmidt v. Merchants Desp. Transp. Co. (270 N.Y. 287, 200 N.E. 824) to Consorti v. Owens–Corning Fiberglas Corp. (86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301).*
(Emphasis added.)

dissenting] ). Thus, according to the dissent in *Steinhardt* [,] summary judgment was precluded because a question of fact was presented as to the date of injury, that is, "when the damaging disease came into existence" (*id.*). Here, the District Court resolved that same issue of fact in plaintiff's favor, determining on the basis of the medical proof that "Consorti was not injured (*i.e.*, he did not have mesothelioma) prior to his marriage" (*In re New York Asbestos Litig.*, 847 F.Supp. 1086, 1104). Thus, the District Court's decision here is in irreconcilable conflict with the result in *Matter of Steinhardt*.

Nor do our more recent cases offer support for plaintiff's position. Once again, in *Fleishman v. Lilly & Co.* (62 N.Y.2d 888 [478 N.Y.S.2d 853, 467 N.E.2d 517], *remittitur amended* 63 N.Y.2d 1017, 1018 [484 N.Y.S.2d 536, 473 N.E.2d 764], *cert. denied,* 469 U.S. 1192 [105 S.Ct. 967, 83 L.Ed.2d 972]), a majority of this Court refused to depart from the Schmidt doctrine *equating injury with exposure to the toxic substance,* that is, its introduction into the body, despite the urging of the dissent that "at the very least, a true data of medical-injury should be adopted for the accrual of the causes of action" (62 N.Y.2d, at 892 [478 N.Y.S.2d 853, 467 N.E.2d 517], *supra* [Cooke, Ch. J., dissenting] ). Most recently, in *Snyder v. Town Insulation* (81 N.Y.2d 429 [599 N.Y.S.2d 515, 615 N.E.2d 999]), we again expressed our adherence to the rule that the tortious injury is deemed to have taken place upon introduction of the toxic substance into the body. In *Snyder,* we quoted from our decision and that of the Appellate Division in *Matter of Steinhardt v. Johns–Manville Corp.* (54 N.Y.2d 1008 [446 N.Y.S.2d 244, 430 N.E.2d 1297], *supra* ): "[in *Steinhardt* ], we 'reaffirm[ed] the principle announced in Schmidt and followed in Schwartz '.... That principle had been stated correctly in the decision of the Appellate Division, the order which we affirmed in Steinhardt.' ' "The injury occurs when there is a wrongful invasion of personal or property rights and then the cause of action accrues" ' (78 A.D.2d 577 [432 N.Y.S.2d 422], quoting Schmidt, and citing *Thornton* and Schwartz )"

(*Snyder v. Town Insulation*, 81 N.Y.2d, at 434–435 [599 N.Y.S.2d 515, 615 N.E.2d 999], *supra* ).

Thus, through succeeding generations of judges composing this Court, over some 60 years, the *Schmidt* rule fixing the occurrence of tortious injury as the date when the toxic substance invades or is introduced into the body, has been reconsidered and reaffirmed, despite importunings that adoption of a medical date-of-injury standard would achieve more just results. Nothing has been presented here to warrant departure from *Schmidt* and the resultant destabilizing of what is now a settled, certain principle of New York tort law. *It follows that, as a matter of law, Mr. Consorti's tortious injury occurred when he was exposed to and inhaled asbestos during the 1960s, before his marriage, and that Mrs. Consorti has no viable loss of consortium claim.*

*Id.* (emphasis added).

Other courts have agreed with the *Consorti* Court that even in latent disease cases—where the injury was not discovered or discoverable until after marriage—no loss of consortium cause of action exists if the parties were unmarried at the time of injury. *See Gross v. Sauer*, No. 37 83 58, 1992 WL 205277, at *1–*2 (Conn.Super.Ct. Aug.14, 1992); *Fullerton v. Hospital Corp. of Am.*, 660 So.2d 389, 391 (Fla.Dist.Ct.App.1995) ("In the absence of any statutory law on this point, Florida courts are required to follow the common-law rule.").

Owens–Illinois has long argued (*see, e.g., Owens–Illinois v. Armstrong*, 326 Md. at 120–21, 604 A.2d 47) that for purposes of the "cap" statute a cause of action for an asbestos-related disease "arises" at the same time it "accrues." That argument was rejected in *Armstrong* and more recently in *Scribner*, 369 Md. at 390, 800 A.2d 727. In its brief filed prior to the *Scribner* decision, Owens Illinois argues that, if the court should hold that for purposes of the cap statute the injury "arises" when the asbestos is inhaled, it would be manifestly unfair if we were to hold that, for purpose of application of the common law loss of consortium rule, the joint injury arose at any later date. Owens Illinois argues: "The word 'injury'

cannot be interpreted differently depending on whether the interpretation helps or hurts [p]laintiffs." The last sentence of this argument is, of course, true, and the overall argument does have surface appeal. But it must be remembered that the common law consortium rule does not necessarily depend upon when the injury "arises." It must also be considered that *Scribner* was interpreting a statute, and the decision was based on an examination of the exact words chosen by the legislature together with that statute's purpose and legislative history. *See Scribner,* 369 Md. at 394, 800 A.2d 727.

The Gianottis note that the applicable rule, set forth in the case of *Sawyer v. Bailey,* 413 A.2d 165, 167 (Me.1980), and adopted by us in *Gillespie–Linton v. Miles, supra,* looks to when the cause of action accrues—not when it arises. And a cause of action did not "accrue," at least for statute of limitations purposes, until the injury was discovered, or reasonably should have been discovered. *See Owens–Illinois v. Armstrong,* 326 Md. at 120–21, 604 A.2d 47. Here Mr. Gianotti's injury did not accrue until he found out he had cancer, which was long after the date of his marriage. *Id.* Nevertheless, we give little weight to the use of the word "accrue" in the *Sawyer* case because both *Sawyer* and *Miles,* which quoted *Sawyer,* involved injuries received in car accidents where the injured spouse's cause of action both arose and accrued on the same date. Moreover, in discussing the common law rule, the *Miles* Court did not rely exclusively on Sawyer. The *Miles* Court also quoted from cases that variously focus on the "date the injury 'occurred.' " (*Rockwell v. Liston,* 71 Pa. D. & C.2d 756 (1975), and *Childers v. Shannon,* 183 N.J.Super. 591, 444 A.2d 1141 (1982)); the date that "the cause of action arose" (*Akers v. Martin,* 14 Pa. D. & C.3d 325, 328 (1980)); and "the time of the accident" (*Hendrix v. General Motors,* 146 Cal. App.3d 296, 193 Cal.Rptr. 922, 927 (1983)). *See Miles,* 58 Md.App. at 488–96, 473 A.2d 947. The reason that most of the cases do not distinguish between (1) date of accrual of a cause of action, (2) the date the injury arises, (3) the date of injury, or (4) the date of the accident is because the dates are usually the same-and thus there was no reason to be careful about the

precise phrase used. This is in marked contrast to the cap statute where "the Legislature has cast the statute in terms of when the cause of action 'arises,' not when, for statute of limitation purposes, the cause of action accrues.' " *Scribner*, 369 Md. at 384, 800 A.2d 727.

Aside from the variance in language in the expression of the common law rule, the expression of its rationale has varied-at least to some degree, *viz:*

> [T]he existence of a lawful marital relationship at the time of the tortious conduct toward and resultant injury to one spouse is required before the other spouse can bring an action for loss of consortium has been variously stated: [A] person should not be permitted to marry a cause of action, *Wagner v. International Harvester Company*, 455 F.Supp. 168 (D.Minn.1978); *Sartori v. Gradison Auto Bus Co.*, [42 Pa. D. & C.2d 781 (1967) ]; one takes a spouse in the then existing state of health and thus assumes the risk of any deprivation resulting from prior disability, *Rademacher v. Torbensen*, 257 A.D. 91, 13 N.Y.S.2d 124 (App. Div.1939); on social policy grounds, liability at some point must be delimited, *Tong v. Jocson*, 76 Cal.App.3d 603, 142 Cal.Rptr. 726 (Cal.App.1977). We have no hesitance in expressing our agreement with these courts where the issue is the right to claim consortium where the tortious conduct *and fact of injury* were both known or knowable prior to marriage.

*Stager v. Schneider*, 494 A.2d 1307, 1315–16 (D.C.App.1985).

In the *Stager* case, Dixie Stager ("Dixie") and her husband sued a doctor for negligently failing to tell Dixie about a spot or shadow he saw when he x-rayed her lungs. *Id.* at 1310. The x-rays were taken in March 1980; Dixie married her husband, Patrick, in June 1980 but did not discover the spot on her lung, nor did she undergo treatment for the cancer, until after the marriage. *Id.* at 1310. One of the issues presented in *Stager* was whether a loss of consortium claim could be brought in view of the fact that, while the tort (failure to advise of the x-ray reading) accrued before the marriage,

the cause of action did not accrue (for statute of limitations purposes) until after the marriage. *Id.* at 1315. The *Stager* Court held:

Under District of Columbia law, Mrs. Stager's cause of action for medical malpractice did not accrue until, at the earliest, December 1980 for it was only then that she knew or by the exercise of due diligence should have known of the injury. *Burns v. Bell, supra,* 409 A.2d 614, 617 (D.C.1979); *see generally Ehrenhaft v. Malcolm Price, Inc.,* [483 A.2d 1192 (D.C.1984) ]. We recognize that our discovery rule has been fashioned by construing the words "accrued" or "accrual" contained in our Statutes of Limitation, *see, e.g.,* 483 A.2d at 1198–99, construing D.C.Code § 12–301(8) (1973). However, we believe the rationale of those decisions (and those of other jurisdictions adopting the discovery rule) to be relevant to our decision here. We have stated that the discovery rule "emerged to redress situations in which the fact of injury was not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred." *Ehrenhaft v. Malcolm Price, Inc., supra,* 483 A.2d at 1201. A spouse's claim for loss of consortium generally could not accrue until the other spouse's cause of action for negligence accrued. We see no reasons of sufficient merit which counsel against viewing the marital status at the time the cause of action accrues as being the relevant time. Unlike those cases such as *Sawyer v. Bailey, supra,* where the wrongful conduct as well as the fact of injury was known prior to marriage, here, neither the wrongful conduct nor the fact of injury was known prior to marriage. Here, one cannot say that Mr. Stager was marrying a lawsuit. *Cf. Wagner v. International Harvester Co., supra; Sartori v. Gradison Auto Bus. Co., supra.*

*Id.* at 1316 (footnote omitted).

Since *Stager* was decided, several other jurisdictions have followed its lead in cases where, prior to the marriage, the spouse-to-be did not know, nor could the prospective spouse reasonably have been expected to know, of the ante-nuptial injury. *See Green v. A.P.C.,* 136 Wash.2d 87, 960 P.2d 912,

919 (1998); *Kociemba v. G.D. Searle & Co.*, 683 F.Supp. 1577, 1578 (D.Minn.1988); *Aldredge v. Whitney*, 591 So.2d 1201, 1205 (La.App.1991); *Furby v. Raymark Industries, Inc.*, 154 Mich.App. 339, 397 N.W.2d 303, 307 (1986). *See also Friedman v. Klazmer*, 315 N.J.Super. 467, 718 A.2d 1238 (1998); *Cleveland v. Johns–Manville Corp.*, 547 Pa. 402, 690 A.2d 1146, 1149 (1997).

Academics have also expressed views similar to those adopted in *Stager*. *See* n. 3, *supra*. *See also* Paul David Fasscher, note: *To Have and Not Hold; Applying the Discovery Rule to Loss of Consortium Claim Stemming from Premarital, Latent Injuries*, 53 Vand. L.Rev. 685 (2000) (hereafter "Fasscher"); JoAnne M. Baio, *Loss of Consortium: A Derivative Injury Giving Rise to a Separate Cause of Action*, 50 Fordham L.Rev. 1344, 1345–46 (1983).

Fasscher concludes his note as follows:

The concerns that led to the traditional approach to loss of consortium claims are not present in the premarital, latent injury context. The traditional approach requiring marriage at the time of injury developed to prevent persons from marrying an injured person for the purpose of creating a loss of consortium claim. Courts adhered to the traditional approach so that the recognition of a claim where the plaintiff had assumed the risk would not extend liability to unlimited proportions, unfairly burdening the tortfeasor.

Where the premarital injury is latent, these threats do not exist, for it is impossible to "marry a lawsuit," or assume a risk, where the injury is unknown and unknowable at the time of the marriage. Furthermore, application of the discovery rule to loss of consortium claims stemming from latent, premarital injuries does not extend liability beyond the traditional parties. The traditional approach denying this type of claim fails to consider that equitable principles and the history of the cause of action suggest that courts should apply the discovery rule in cases of premarital, latent injuries. The discovery rule is available to rescue the underlying claim from the statute of limitations; it likewise

should be available to rescue a loss of consortium claim from the traditional marriage requirement. Courts that have disagreed with this reasoning have misunderstood both the modern conception of loss of consortium and the discovery rule.

The same principles that led courts and legislatures to create the discovery rule are the principles that justify application of the rule to loss of consortium claims in the premarital, latent injury context. Failure to apply the discovery rule to these claims is blind limitation of the past resulting in denial of recovery to spouses who, through no fault of their own, could not have discovered their claim until after the wedding bells rang.

57 Fordham L.Rev. 714–15.

We agree with Fasscher and the *Stager* Court that the core reason behind the rule adopted by the common law was that a person should be prevented from profiting by a conscious decision to acquire a cause of action by marrying an injured party. We also agree with the *Stager* Court and Fasscher that neither the core reasons nor any of the other reasons behind the common law rule have any logical force when the injury was not discovered, and could not have been reasonably discoverable, at the time of the marriage.

For the foregoing reasons, we hold that for purposes of applying the common law rule enunciated in *Miles, supra,* a loss of consortium claim is barred only if, at the time the parties marry, the couple knew or reasonably should have known of the injury that formed the basis for their joint claim. We, therefore, conclude that the trial judge did not err in allowing the jury to consider the Gianottis' joint loss of consortium claim—inasmuch as it is undisputed that when the Gianottis married in 1986, his mesothelioma was neither discovered nor could it have reasonably been discoverable.

## VI.

Cross-appellants make the following argument:

The trial court erred in reducing the judgment under the UCATA because Babcock and Wilcox was not found to be a joint tortfeasor and because there was no settlement between Babcock and Wilcox and the plaintiffs.

To understand that argument, it is necessary to understand the Court of Appeals's decision in *Porter Hayden Co. v. Bullinger*, 350 Md. 452, 713 A.2d 962 (1998).

*Bullinger* was an asbestos case in which Porter Hayden was one of the defendants. Porter Hayden filed a third-party claim against B & W. When B & W failed to file a responsive pleading, Porter Hayden moved for, and was granted, a default judgment against it. *Id.* at 457, 713 A.2d 962. Prior to a jury verdict against Porter Hayden, the plaintiffs settled their case with B & W. *Id.* at 471, 713 A.2d 962. At the conclusion of the trial, the jury was not asked to determine whether B & W was a joint tort-feasor. *Id.* at 458, 713 A.2d 962.

The issue in *Bullinger* was "whether the default judgment on Porter Hayden's third-party claim entered against B & W constituted a determination of liability such that B & W should be considered a joint tortfeasor for purposes of section 3–1404 of the Courts and Judicial Proceedings Article." [5] *Id.* at 471, 713 A.2d 962. The Court held that "[a]lthough no determination as to B & W's liability was made by a judge or jury, B & W's admission of liability, resulting from the entry of default judgment, is sufficient to establish it as a joint tort-feasor under the [UCATA]." *Id.* at 472, 713 A.2d 962. As a consequence of that ruling, the Court held that the trial court's failure to consider the default in calculating the amount of the

---

**5.** Section 3–1404 of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) reads:

**Effect of release on injured person's claim.**

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

final judgment constituted a failure to recognize what damages were due the third-party plaintiff as a result of the default. *Id.* at 473, 713 A.2d 962.

In the case at hand, the trial judge, based on the decision in the *Bullinger* case, reduced the judgment entered against ACandS and Owens–Illinois pursuant to the UCATA. The Gianottis claim that the trial judge erred in doing so because

> the default judgment occurred in a case where the [p]laintiffs' complaint sought damages resulting from asbestos lung disease, which was resolved by settlement with all defendants. The present cause of action for mesothelioma is completely separate from the previous asbestosis case and had not even accrued when the first case was resolved. The scope of the admission of liability resulting from a default judgment is determined by the matter at issue in the proceeding.

Owens–Illinois has no quarrel with the proposition that the "scope of the admission of liability resulting from a default judgment is determined by the matters at issue in the proceeding." Where it parts company with the cross-appellants is with the assertion that the "present cause of action for mesothelioma is completely separate from the previous asbestosis case . . . ."

The case filed by the Gianottis has been pending against Owens–Illinois since 1987. It was one of the hundreds of cases consolidated in 1994. Contrary to the implication in cross-appellants' argument, the Gianottis never amended their complaint after Mr. Gianotti, in 1999, was diagnosed with mesothelioma. As Owens–Illinois correctly points out, the complaint pending before the Court at the time the jury returned its verdict in the *Gianotti* case is the original complaint filed in 1987, which was the exact complaint pending at the time of the default judgment in 1994. The Gianottis' short-form complaint—filed in 1987—incorporated by reference the allegations in a master complaint filed by the law firm of Peter G. Angelos—the firm representing the Gianottis.

That master complaint alleged that the plaintiff had suffered injuries from unspecified "asbestos-related diseases." Mesothelioma is, of course, an "asbestos-related disease."

Under such conditions, the effect of the default judgment entered against B & W in the instant case was the same as in *Bullinger.*

In Maryland a default judgment is considered more akin to an admission of liability than to a punitive sanction. In *Hopkins v. Easton Nat'l Bank,* 171 Md. 130, 134, 187 A. 874 (1936), this Court said that a default results in "the tacit admission by the defendant in default of the truth of the allegations of the bill of complaint as they are averred." In *Pacific Mortgage & Inv. Group, Ltd. v. Horn,* 100 Md.App. 311, 332, 641 A.2d 913 (1994), the Court of Special Appeals stated that "[a] judgment by default constitutes an admission by the defaulting party of its liability for the causes of action set out in the complaint." And finally, in *Gotham Hotels, Ltd. v. Owl Club, Inc.,* 26 Md.App. 158, 173, 337 A.2d 117 (1975), the Court held that "failure to plead . . . constituted an admission . . . of liability for the cause of action set forth in the declaration."

*Bullinger,* 350 Md. at 472, 713 A.2d 962 (citing *Curry v. Hillcrest Clinic, Inc.,* 337 Md. 412, 434–36, 653 A.2d 934 (1995)).

Cross-appellants argue, in the alternative, that even if B & W should have been considered a "joint tortfeasor," Owen–Illinois is not entitled to any benefit from that designation in this case, because the Gianottis never settled the mesothelioma case with B & W. Owens–Illinois, on the other hand, claims there was such a settlement.

The trial judge, after presiding at two hearings concerning this issue, determined that the Gianottis had, in fact, settled with B & W. To determine whether the trial judge was right in this regard, requires us to set forth, in detail, some of the rather complex dealings between B & W and the Angelos law firm.

B & W was a manufacturer of boilers that were insulated with asbestos containing products. In 1988, B & W entered into a settlement/processing agreement with the law office of Peter G. Angelos. As a result of that agreement, Mr. Gianotti settled with B & W his then-existing asbestosis claim. Moreover, pursuant to the processing agreement, Mr. Gianotti gave B & W a *"pro tanto"* release—rather than a Swigert-type release. *See Swigert v. Welk,* 213 Md. 613, 133 A.2d 428 (1957). In 1994, after B & W was sued as a third-party defendant in the pending consolidated cases, B & W renegotiated its agreement with the Angelos office. Additional monies were paid to the Gianottis (and many others) as a result of that renegotiated agreement, and in consideration for the additional monies, the various plaintiffs signed a Swigert-type release for the damages related to illnesses from which they were then suffering. The 1994 agreement provided categories for determining the settlement amount owed.[6] The agreement also specified five separate disease categories, one of which was mesothelioma. Plaintiffs, such as Mr. Gianotti, who had already been paid, pursuant to the November 1988 settlement agreement, retained, under the 1994 agreement, two financial rights. One was the right to receive additional payments for the disease process (in Mr. Gianotti's case, asbestosis) already resolved with B & W. Additionally, pursuant to Paragraphs 7 through 11 (entitled "Procedure for Subsequent Disease Plaintiffs"), Angelos's clients retained the right to receive additional amounts designated for, *inter alia,* asbestos-related mesothelioma. The agreement spelled out how much each of the Angelos firm's clients would receive in the event that they contracted mesothelioma. Paragraph 14 provided that the Angelos office "agrees to recommend the acceptance of the Settlement Agreement...." Individual clients of the Angelos office reserved the right to reject the offer of settlement, but in order to do so, they were required to notify B & W "as soon as possible, but, in no event, no later

---

**6.** Categories of plaintiffs included "Bethlehem Steel Workers," "Non–Bethlehem Boilermakers," and "Non–Bethlehem/Non–Boilermaker tradesmen."

than 90 days prior to [p]laintiff's post-consolidation trial date." A form Swigert-type release was appended to the 1994 agreement, which set forth the form of the release that would be signed if the parties settled.

The trial date for the commencement of the consolidated case involving the Gianottis was February 1, 2000. Thus, under the agreement, if the Gianottis elected not to accept the settlement amount for mesothelioma, they were required to notify B & W by November 2, 1999 (90 days before the February 1, 2000, start of the post-consolidation trial).

Arman V. Volta, Jr., Esq., an employee of the Angelos law firm, served as a liaison between the law firm and B & W. In 1999, issues arose between B & W and the law firm due to B & W's failure to make timely payment to various plaintiffs, pursuant to the 1994 agreement. In Mr. Volta's words,

We weren't getting paid by [B & W] for claims that we have agreed to dollar amounts with them for and for which we have transmitted releases, mainly for the entire year of 1999 trial docket cases that were either what has become known as come back or second disease cases, and also, original cases ... that had never been submitted to [B & W] ...— new mesothelioma cases in particular.

Shortly after the commencement of trial in the subject case, in early February 2000, Mr. Volta met with representatives of B & W in an effort to resolve problems of non-payment. In addition, the parties had discussions regarding cases that had been set for trial in the year 2000. Mr. Volta prepared a chart containing the names of approximately a hundred plaintiffs and the settlement amounts that the Angelos law firm had agreed to recommend to their clients for each person named. Among the names on the chart, which was given to B & W, was that of Mr. Gianotti.

At a meeting on February 7, 2000, at which the chart was discussed, B & W said, according to Mr. Volta's testimony, that it would "get back to" the Angelos firm "concerning the monies owed" and "there would [be] assurances on definite time period for payments for the back cases, as well as for the

cases shown on the chart." At the time the chart was delivered, Mr. Volta testified that B & W was informed that the Angelos office did not intend "to extend offers" to their clients "without assurances from B & W" that payment would be forthcoming. About two weeks after the chart was given to B & W, the latter filed for federal bankruptcy protection.

Mr. Volta testified at the post-trial hearing that the Angelos firm had not decided whether to file a claim against B & W in the bankruptcy court. Part of their decision in this regard depended on the outcome of the pending post-trial motion, *i.e.*, whether B & W was treated by the court as a joint tortfeasor protected by a Swigert-type release given by the Gianottis.

Meanwhile, as Mr. Volta was in the process of negotiating with representatives of B & W, the subject case was under way. At trial, B & W, as a third-party defendant against whom a default judgment had been entered, was represented by counsel. On February 10, 2000 (three days after Mr. Volta had presented the chart to B & W), counsel for B & W approached the bench and the following exchange occurred:

MR. HOWARD [COUNSEL FOR B & W]: I just want to call the Court's attention, my role has become even more limited. *We have resolved our differences,* but my client wishes me to remain [in the courtroom], so I will be here in an even less significant capacity than I had planned.

(Emphasis added.)

The trial judge then responded, jokingly, that "the only way [counsel's involvement] could be less is if you moved back a row or two." Counsel for Owens–Illinois and ACandS interpreted Mr. Howard's announcement that "[w]e have resolved our differences" to mean that B & W had settled with the plaintiffs. And, because of the holding by the Court of Appeals in *Bullinger, supra,* counsel for the defendants did not ask the jury to determine whether B & W was a joint tortfeasor.

During the hearing on the post-trial motions, the trial judge (referring to Mr. Howard's comments) directed the following remarks to counsel for the Gianottis:

I am trying to determine what can a court and opposing counsel rely on. What do they have a right to rely on?

A lawyer gets up and during the trial and says we have resolved our differences with the plaintiff, we are settled, we are finished, may I be excused, Your Honor? Yep, go ahead, take off. Does the court have a right to rely on that statement? Does opposing counsel have the right to rely on that statement?

* * *

... [Y]ou were there.

* * *

You never go up and said, whoa, wait a minute, counsel is inaccurate, we are not resolved.

Ultimately, the trial judge ruled that there had been a settlement between the Gianottis and B & W and, therefore, that ACandS and Owens–Illinois were entitled to a pro-rata reduction of the jury verdicts. The court reasoned as follows: (1) As the Court of Appeals held in *Bullinger*, in order to find that B & W was a joint tortfeasor, it is unnecessary to have a jury finding that B & W is liable-a default judgment against B & W would suffice; (2) whether or not there was a formal written release is not determinative in deciding whether the defendants were entitled to a pro-rata reduction under section 3–1404 of the Courts and Judicial Proceedings Article; (3) the Gianottis signed releases and obtained payment in 1994 pursuant to the revised agreement with the Angelos law firm; (4) pursuant to the agreement with that law firm, the Gianottis retained the right to receive additional amounts (as spelled out in the revised agreement) should they later discover that Mr. Gianotti suffered from a new disease; (5) the subsequent procedures, to receive the monies agreed upon were a mere formality, inasmuch as there was a settlement as to the dollar amount between the Gianottis and B & W; (6) his finding that there had been a binding settlement was bolstered by the fact that when B & W's attorney said that the case had been

settled, plaintiffs' attorneys did not object;[7] and (7) under the circumstances, opposing counsel had a right to rely on the announced settlement. The court concluded in these words:

> So, based on *Bullinger*, . . . [I find that B & W is] a joint tortfeasor, and based on my finding that the release process was really agreed to and there was sufficient compliance with the release process to satisfy the statute, I think that there . . . should be a pro-rata reduction based on B & W's settlement.

Cross-appellants claim that the trial judge was clearly erroneous in finding that they had settled their claim with B & W. They stress that, under the 1994 agreement with the Angelos law office, their clients were entitled to make "the ultimate decision whether to accept or reject" the amounts set forth in the agreement, and here, Owens–Illinois introduced no evidence showing that the Gianottis had accepted B & W's offer to settle the mesothelioma claim. That argument overlooks the fact that, under the agreement, the Gianottis' option to reject the settlement was time limited, *i.e.*, if a settlement was rejected, the client was required to notify B & W at least ninety days prior to their "post-consolidation trial date." Here, it was undisputed that the cross-appellants did not notify B & W of their rejection of the settlement figure within ninety days of their "post-consideration trial date." The trial judge was therefore not clearly erroneous when he found that

---

7. Cross-appellants argue that Owens–Illinois had no right to rely on their silence when B & W's counsel said, in effect, that there had been a settlement. In support of that argument, cross-appellants stress that they (the Gianottis) never sued B & W in the present case. This argument, which was not made below, is too clever by half. And, it overlooks Mr. Volta's testimony that there were negotiations with B & W that concluded just before Mr. Howard made the "all problems resolved" statement to the court. Under *Bullinger*, of which all counsel involved in the subject litigation were well aware, it did not matter whether B & W had been sued by the plaintiffs so long as B & W settled with the plaintiffs. Here, based on the terms of the 1994 agreement with the Angelos law firm—of which the Gianottis were aware because they benefitted by it back in 1994 when they received additional monies pursuant to it—the Gianottis, by not rejecting the settlement offer within ninety days of trial, accepted it.

there had been a settlement between B & W and the Gianottis.[8]

For the foregoing reasons, we hold that the trial judge was justified in giving effect to the settlement between B & W and the Gianottis by treating Babcock and Wilcox as joint tortfeasors.

**JUDGMENT AFFIRMED; COSTS TO BE PAID SEVENTY–FIVE PERCENT BY OWENS–ILLINOIS AND TWENTY–FIVE PERCENT BY THE CROSS–APPELLANTS.**

---

**8.** It should be mentioned that the fact that the settling plaintiff has not been paid, due to bankruptcy, after a settlement agreement has been reached does not affect the issue of whether a non-settling defendant is entitled to a pro-rata reduction of a jury verdict under the UCATA. *See Rocco v. Johns–Manville Corp.,* 754 F.2d 110, 111 (3d Cir.1985) ("[A] release in favor of a joint tortfeasor who files a petition in bankruptcy before paying the agreed settlement amount *does act* to reduce the [p]laintiff's verdict pro rata.").