872 A.2d 969

**OWENS–ILLINOIS, INC.**

v.

**Harry COOK, Sr., et al.**

**No. 10, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 26, 2005.

Robert H. Riley (Schiff, Harden & Waite, Chicago, IL, Gerry H. Tostanoski, Scott Patrick Burns, Dana A. Gausepohl, Tydings & Rosenberg, LLP, Baltimore, on brief), for petitioner/cross-respondent.

Edward J. Lilly (Scott Shellenberger, Law Offices of Peter G. Angelos, Baltimore, on brief), for respondents/cross-petitioner.

Argued before BELL, C.J., ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

BELL, C.J.

Having granted the petition, filed by the petitioner, Owens–Illinois, and the cross-petition, *see Owens–Illinois v. Cook,* 374 Md. 82, 821 A.2d 370 (2003), filed by the respondents, John A. and Shirley Gianotti, for writ of certiorari,[1] this Court must decide four issues: whether, under the parties' 1994 settlement agreement, pursuant to which the respondents signed a release reserving their claims for certain "future disease[s]," in an asbestos-related personal injury case, Maryland's statutory cap on non-economic damages, Md.Code (1974, 2002 Rep. Vol.) § 11–108 of the Courts and Judicial Proceedings Article (hereinafter "Statutory Cap"),[2] applied to bar the respondents'

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. The respondents' case was consolidated at trial with four other cases, one of which was an action by Harry S. Cook, et. al against AC and S, Inc. The appeal of the petitioner and ACandS, Inc. to the Court of Special Appeals was captioned *Owens–Illinois v. Gianotti, et ux.* and *ACandS, Inc. v. Harry S. Cook, et. al.* The respondents and the plaintiffs in two of the other cases cross-appealed, after which they and ACandS reached a settlement, pursuant to which ACandS dismissed its appeal. The Court of Special Appeals then issued its opinion, affirming the judgment of the Circuit Court for Baltimore City. Thereafter, the petitioner moved for reconsideration and, still later, it and the respondents sought certiorari. The intermediate appellate court denied the motion for reconsideration in an unreported opinion, which it captioned, *Owens–Illinois v. Harry Cook, Sr., et al.,* even though the appeal involving Harry Cook had been dismissed. The petitioner's petition and the respondents' cross petition for writ of certiorari were filed under that caption. Since the only issues before this Court are those raised by the petitioner and the respondents, also the only parties before the Court, we have amended the caption to reflect that reality.

2. Md.Code (1974, 2002 Rep. Vol.) § 11–108 of the Courts and Judicial Proceedings Article, as relevant, states:

"(a)(1) In this section the following words have the meanings indicated.

"(2)(i) 'Noneconomic damages' means:

"1. In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

"2. In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice,

claim for mesothelioma and loss of consortium; when, in a latent disease case, a loss of consortium case arises for purposes of the "cap" statute; whether, in light of our decisions in *John Crane, Inc. v. Scribner*, 369 Md. 369, 372, 800 A.2d 727, 728 (2002) and *Georgia–Pacific Corp. v. Pransky*, 369 Md. 360, 363, 800 A.2d 722, 723 (2002), the respondents' loss of consortium claim, based on an injury incurred before they married, is barred as a matter of law and whether the judgment for the respondents was properly reduced pursuant to Maryland Code (1997, 2001 Rep. Vol.) § 3–1401 *et. seq.* of the Courts and Judicial Proceedings Article, the Uniform Contribution Among Tortfeasors Act ("UCATA"), based on a default judgment entered against a third party defendant, (Babcock & Wilcox), in *Porter Hayden Co. v. Bullinger*, 350 Md. 452, 713 A.2d 962 (1998), an asbestos case, who is also a third party defendant in the case *sub judice* and where there was, in the case *sub*

---

counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article.

(ii) "Noneconomic damages" does not include punitive damages.

"(3) 'Primary claimant' means a claimant in an action for the death of a person described under § 3–904(d) of this article.

"(4) 'Secondary claimant' means a claimant in an action for the death of a person described under § 3–904(b) of this article.

"(b)(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

"(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

"(ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

"(3)(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

"(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award."

*judice,* no finding that the defaulting party was a joint tortfeasor. We shall affirm.

## I.

The facts pertinent to the resolution of this appeal, stated in the light most favorable to the respondents, the prevailing parties on liability at trial, *see Board of County Com'rs of Garrett County, Md. v. Bell Atlantic–Maryland, Inc.,* 346 Md. 160, 182, 695 A.2d 171, 182 (1997); *Burroughs Intern. Co. v. Datronics Engineers, Inc.,* 254 Md. 327, 337–338, 255 A.2d 341, 346 (1969); *Goodwin v. Lumbermens Mutual Cas. Co.,* 199 Md. 121, 129–30, 85 A.2d 759, 762–63 (1952), can be summarized quickly and simply. John Gianotti was exposed to asbestos between 1956 and 1974, while employed as a laborer and ceiling installer. In August 1985, he was diagnosed with "asbestos lung disease." Ten months after that diagnosis, and just short of a month before § 11–108 became effective, *see* Acts 1986, ch. 639, effective July 1, 1986, Mr. Gianotti and the respondent Shirley Gianotti were married. The following year, the respondents filed suit against various manufacturers and suppliers of asbestos containing products, including the petitioner, alleging both that Mr. Gianotti suffered "asbestos lung disease" as a result of exposure to their products and, as a result of that disease, loss of consortium. The petitioner and the respondents entered into a settlement agreement with respect to that suit in 1994.[3] As required by the settlement agreement, the respondents executed a "Release and Settlement of Claim," in which they released the petitioner from the claim that John Gianotti "[h]as contracted the disease known as asbestosis."

The release also provided:

"It is the specific intent of this release to release and discharge [Owens–Illinois] for any and all further claims relating to the matters for which recovery was sought in the

---

**3.** The settlement was, the petitioner advises, citing *ACandS v. Godwin,* 340 Md. 334, 667 A.2d 116 (1995), a part of its broader settlement of the *Abate I* consolidation of 8,555 cases.

Circuit Court for Baltimore County, Case Number 87CG3549/45/19, including any and all claims made in the Complaint, Answers to Interrogatories, depositions, reports of medical experts prepared at the request of me/us and/or my/our attorneys, and opinions rendered concerning the condition of JOHN GIANOTTI by experts retained by me/us and/or my/our attorneys, regardless of the future progression or course of the medical conditions alleged to exist therein, including death resulting from that/those conditions (all such claims are hereinafter referred to as the 'existing lawsuit')."

The preceding paragraph was further clarified by inclusion of an exception which expressly limited its effect:

"[i]t is not the intent of this release, and I/we specifically do not release claims for cancer, mesothelioma and or other malignancies or death resulting from cancer, mesothelioma or other malignancies not alleged or described in the existing lawsuit allegedly resulting or to result from JOHN GIONOTTI'S exposure to asbestos (hereinafter described as 'future disease')."

The respondents also acknowledged in the release that:

"[Owens–Illinois], by making payment herein and agreeing to the form and content of this Release, [is] likewise not admitting or conceding any liability for any future disease that may occur, nor [is it] estopped in the future on any grounds to contest [its] liability therefor[ ], and neither settlement, payment nor existence of this release may be used against [Owens–Illinois] in any way to attempt to prove liability or fault for any future disease."

In March 1999, more than four years after executing the release, Mr. Gianotti was diagnosed with mesothelioma.[4] The

---

4. The National Cancer Institute defines Mesothelioma as a disease in which cancer (malignant) cells are found in the sac lining the chest (the pleura) or abdomen (the peritoneum). This is a rare form of cancer and most people with malignant mesothelioma have worked on jobs where they breathed asbestos. *National Cancer Institute, Questions and Answers, Cancer Facts 6.36—Mesothelioma* (May 13, 2002).

respondents thereafter sought recovery for this injury and the accompanying loss of consortium from the asbestos manufacturers, suppliers and installers they previously had sued for asbestos lung disease. They did not file a new lawsuit, however; rather, the mesothelioma claim proceeded under the short form complaint filed in 1987, which incorporated, by reference, allegations in a master complaint for unspecified "asbestos-related diseases," filed by their attorney.

Before trial, the petitioner challenged the viability of John Gianotti's mesothelioma claim and, therefore, the respondents' loss of consortium claim through a counterclaim for declaratory judgment. In that pleading, it claimed that, under the release executed by the respondents, the mesothelioma was either a "future disease" and, therefore, subject to the cap on noneconomic damages, or an existing "asbestos-related disease" and, thus, released by the express terms of the parties' settlement agreement. The trial court disagreed and, on motion of the respondents, dismissed the counterclaim. It reasoned:

"I think ['future disease'] is a term of art. [The release document] says hereinafter referred to—described, hereinafter described as future disease, and future disease is in quotation marks.

"So it's a term that's being used to talk about what will happen if there is a claim later for some form of cancer.

"The Fact that [the release document says] future disease I don't think this is a future disease without the quotation marks.

---

We have also described the disease of mesothelioma, "as a malignant tumor that forms in the body cavities, predominantly the thoracic and abdominal cavities. In the thoracic cavity, it directly invades and encases the pleura—the outside lining of the lung—and eventually occupies and eradicates the pleural space. It frequently will grow into the lung and, over time, can metastasize to other structures, including the diaphragm and the abdominal cavity." *John Crane, Inc. v. Scribner*, 369 Md. 369, 378–379, 800 A.2d 727, 732 (2002).

"It means at the time that this release was entered into, he hadn't been diagnosed with such a disease, but it doesn't mean that he didn't have it.

. . .

"The question of whether this is a true, future disease, that is without the quotation marks, is really one that's going to depend on the proof that's given at trial.

"It may well be a nonquotation mark future disease and the cap will apply. That's going to be up to a jury to decide based on the evidence that's presented at the time.

"The Court will not apply and I don't think it is right to apply the cap based on the release and based on the information that I have now.

"The defense is asking the Court to apply the cap based solely on the fact that the release refers to something as a future disease. I will not do that." [5]

The court thus adopted the respondents' argument that in using the term, "future disease," the parties were adopting a term of art, or convenient way to say, "undiagnosed disease." After trial, the case was presented to the jury, which returned, *inter alia*, verdicts in favor of the respondents against the petitioner, for the personal injury to Mr. Gianotti and for the joint loss of consortium claim. Following post trial proceedings, including the denial of the petitioner's motion for judgment notwithstanding the verdict, judgment was entered. The jury's verdicts for the respondents were reduced by pro rata releases of adjudicated joint tortfeasors, as well as by a default judgment, entered in favor of the petitioner, against Babcock & Wilcox, an asbestos manufacturer, who also was a third party defendant in the case.

---

5. This is what the trial court said, when granting a motion to dismiss an identical counterclaim based on an identical release, in a case in which the plaintiff was John Todd. That case was scheduled for trial a month before the Gianottis' and the ruling on the motion in that case was adopted by the trial court in this case.

Owens–Illinois noted an appeal to the Court of Special Appeals presenting, in addition to the issues raised in this Court,[6] issues relating to the sufficiency of the respondents' proof as to when their claims arose. That court rejected all of the petitioner's arguments. *Owens–Illinois v. Gianotti*, 148 Md.App. 457, 813 A.2d 280 (2002).

The latter issues, the intermediate appellate court concluded, were resolved by *Scribner, supra*,[7] decided by this Court after oral argument in that court. Thus, it held:

"Although the jury in the case at hand decided that Mr. Gianotti was injured prior to July 1, 1986, it was unneces-

6. According to the respondents, two of those issues, those concerning the loss of consortium claim, "bear[ ] no relationship to the issues argued and decided in the Circuit Court for Baltimore City and those raised and decided in the Court of Special Appeals of Maryland." They submit that the issue raised in the trial court "was simply whether a loss of consortium claim could be maintained if the 'injury' existed prior to the marriage," and that, in the intermediate appellate court, it "was whether the Plaintiffs were required to prove that Mr. Gianotti's mesothelioma arose during the short period of time between his marriage and the effective date of the cap statute." The questions of whether the loss of consortium claim is subject to the statutory cap and when that claim arises were first presented, they state, in the petitioner's motion for reconsideration. Suffice to say, notwithstanding the Court of Special Appeals's disclaimer, the essence of the questions presented in the motion for reconsideration, in fact, was decided by the court and, in any event, those questions were presented in the petitioner's cert. petition, which we granted. *See Richardson v. McGriff*, 361 Md. 437, 525 762 A.2d 48, 96 (2000).

7. In *John Crane, Inc. v. Scribner*, 369 Md. 369, 394–95, 800 A.2d 727, 742 (2002), we held:

"in actions for personal injury founded on exposure to asbestos, the court, as an initial matter, may look, for purposes of § 11–108(b)(1), to the plaintiff's *last exposure* to the defendant's asbestos-containing product. If that last exposure undisputedly was *before* July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law. If the only exposure was undisputedly *after* July 1, 1986, then obviously the cap applies as a matter of law. In those hopefully rare instances in which there was exposure both before and after July 1, 1986, and there is a genuine dispute over whether either exposure was sufficient to cause the kind of cellular change that led to the disease, the trier of fact will have to determine the issue based on evidence as to the nature, extent, and effect of the pre- and post July 1, 1986 exposures." *See* also *Georgia–Pacific Corp. v. Pransky*, 369 Md. 360, 368, 800 A.2d 722, 726 (2002).

sary for the jury to even consider that issue because it was undisputed that the last date of asbestos exposure of Mr. Gianotti was before July 1, 1986. Applying the dictates of the *Scribner* case to the facts of this case, the plaintiffs met their burden of proof as to the cap issue. No evidentiary ruling concerning expert testimony as it related to the issue of when the worker's injury arose could possibly have prejudiced Owens–Illinois because, under *Scribner,* the cap statute was inapplicable as a matter of law."

*Gianotti,* 148 Md.App. at 467–68, 813 A.2d at 286.

Like the trial court, the Court of Special Appeals interpreted the release signed by the respondents as reserving Mr. Gianotti's claim for asbestos related cancers. Unpersuaded by the petitioner's emphasizing of the phrase, "future disease," the intermediate appellate court opined, agreeing with the trial court and the respondents, that:

> "It is clear that, when the parties to the Release used the parenthetical phrase 'hereinafter described as "future disease," ' they used it simply as shorthand to denote what claims that were not being released. Three categories of claims were not being released, *viz,* claims for '(1) cancer, (2) mesothelioma, (3) other malignancies or death resulting from cancer, mesothelioma, or other malignancies not alleged or described in the existing law suit ... resulting or to result from John Gianotti's exposure to asbestos.' [Respondents'] present claims come within the second category."

148 Md.App. at 480, 813 A.2d at 293.[8]

The Court of Special Appeals also rejected the petitioner's argument with respect to when, in a latent disease case, a loss

---

8. For the Court of Special Appeals, this answered both prongs of the petitioner's argument-that the mesothelioma was a future disease which came into being after July 1, 1986 and, for that reason, is subject to the cap, *Owens–Illinois v. Gianotti,* 148 Md.App. 457, 480, 813 A.2d 280, 293 (2002); and that the mesothelioma was already in being when the release was signed and, for that reason, was discharged by the release. *Id.* at 481, 813 A.2d at 294.

of consortium claim arises and the viability of such a claim when, as in the case of the respondents, the marriage is subsequent to the occurrence of the personal injury from which the loss of consortium derives. Agreeing with the respondents that the applicable rule looks to when the cause of action accrues—not when it arises—and that "a cause of action did not 'accrue,' at least for statute of limitations purposes, until the injury was discovered, or reasonably should have been discovered," the intermediate appellate court observed, "Here, Mr. Gianotti's injury did not accrue until he found out he had cancer, which was long after the date of his marriage." *Gianotti*, 148 Md.App. at 489, 813 A.2d at 298–99. After reviewing out-of-State authority and the views of legal commentators, *id.* at 489–493, 813 A.2d at 299–301, particularly *Stager v. Schneider*, 494 A.2d 1307, 1315–16 (D.C.1985), and Paul David Fasscher, Note: *To Have and Not Hold; Applying the Discovery Rule to Loss of Consortium Claim Stemming from Pre-marital, Latent Injuries*, 53 Vand. L.Rev. 685 (2000), addressing "whether the general rule (that no loss of consortium claim exists for an ante-nuptial tort) applies in cases where, at the time of the marriage, the injury to the spouse is latent and therefore has not been, and could not have been, reasonably discovered prior to the marriage," *Gianotti, supra*, 148 Md.App. at 485, 813 A.2d at 296, it held:

---

The petitioner properly takes exception to the argument, advanced by the respondents and adopted by the intermediate appellate court, characterizing it as the draftsman of the release, *see* 148 Md.App. at 480, 813 A.2d at 293, with the necessary suggestion that the release should be construed against it. Maryland follows the objective law of contract interpretation and construction, *Taylor v. NationsBank, N.A.*, 365 Md. 166, 178–179, 776 A.2d 645, 653 (2001); *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001); *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298, 304 (1996), which, as explained in *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (citations omitted), makes clear that, when the language used in the contract is clear and unambiguous, without regard to which party drafted the contract, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Both parties maintain that the release is clear and unambiguous.

"for purposes of applying the common law rule enunciated in *[Gillespie–Linton v.] Miles, supra* [58 Md.App. 484, 495, 473 A.2d 947 (1984) ], a loss of consortium claim is barred only if, at the time the parties marry, the couple knew or reasonably should have known of the injury that formed the basis for their joint claim. We, therefore, conclude that the trial judge did not err in allowing the jury to consider the Gianottis' joint loss of consortium claim—inasmuch as it is undisputed that when the Gianottis married in 1986, his mesothelioma was neither discovered nor could it have reasonably been discoverable."

*Id.* at 493, 813 A.2d at 301.

The respondents cross-appealed, challenging the decision to reduce their judgment, pursuant to the UCATA, based on a default judgment entered against Babcock & Wilcox in a prior proceeding and despite there having been no adjudication, in this case, of Babcock & Wilcox's joint tortfeasor status and the respondents' denial that they had reached a settlement agreement with Babcock & Wilcox. In rejecting the respondents' arguments, the Court of Special Appeals noted that in the prior case, *Bullinger, supra,* 350 Md. at 471, 713 A.2d at 962, the respondents settled their claim with Babcock & Wilcox and emphasized that that case and this one are not, as the respondents' argument requires them to be, completely separate.

The intermediate appellate court was unpersuaded by the respondents' alternative argument that this case is distinguishable from *Bullinger*, in that the respondents, in that case, unlike in this one, did settle with Babcock & Wilcox. In deciding that the respondents and Babcock & Wilcox, in fact, had settled, the trial court noted the course of dealings between the respondents' counsel and Babcock & Wilcox, that there were on-going discussions between Babcock & Wilcox and the respondents' counsel after the trial in this case commenced and those discussions related to efforts to resolve problems of Babcock & Wilcox's non-payment to various plaintiffs who had settled with it and for whom it had signed releases, that three days after the respondents' counsel sup-

plied Babcock & Wilcox with a chart of clients and the recommended settlement amounts, counsel for Babcock & Wilcox advised the court, in the presence of the respondents' counsel and counsel for the petitioner, "[w]e have resolved our differences," and that the respondents' counsel did not dispute that advise.[9] The intermediate appellate court concluded that "[t]he trial judge was . . . not clearly erroneous when he found that there had been a settlement between B & W and the Gianottis." 148 Md.App. at 501–02, 813 A.2d at 306.

## II.

### A.

Since July 1, 1986, it has been legislatively mandated in Maryland that damages for noneconomic loss be limited. *See* Acts 1986, ch. 639. Codified at § 11–108 of the Courts and Judicial Proceedings Article, without accounting for subsequent amendments affecting the amount of noneconomic damages presently permitted, the statute provides:

"(b)(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000."

Although the application of the statute is straightforward and simple in the routine personal injury case, that is not the

---

9. The transcript reflects the following on this point:

"Mr. Howard [Counsel for Babcock & Wilcox]: I just want to call the Court's attention, my role has become even more limited. We have resolved our differences, but my client wishes me to remain [in the courtroom], so I will be here in an even less significant capacity than I had planned."

"The Court: How can it be much less?

"Ms. Tostanoski: So you can't come up here anymore?

"Mr. Howard: I could, but I am not going to.

"The Court: The only way it could be less is if you move back a row or two." (Whereupon, laughter ensued)

Counsel for the petitioner and for ACandS believed that "[w]e have resolved our differences" meant that Babcock & Wilcox had settled with the plaintiffs, and, relying on *Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998), did not ask to have the jury determine whether Babcock & Wilcox was a joint tortfeasor.

case when the personal injury is the result of a disease with a lengthy latency period. In such cases, the answer to the question of when the cause of action "arose" "is largely dependent on the test or standard to be applied in making that determination." *Scribner*, 369 Md. at 382–83, 800 A.2d at 735.

That was what this Court, in *Scribner*, undertook to do, "set the proper standard for determining when, for purposes of . . . the cap statute a cause of action for cancer or other disease based on exposure to asbestos arises." *Id.* at 372, 800 A.2d at 729. In doing so, we identified:

> "Three possible approaches for determining when a cause of action arises for purposes of § 11–108(b)(1): (1) the manifestation approach, which is the latest in time and looks to when the disease sued upon first becomes either symptomatic or diagnosed, (2) the exposure approach, which is the earliest in time and looks to when the plaintiff first inhaled asbestos fibers that caused cellular changes leading to the disease, and (3) the *Grimshaw*[10] approach, which, as to disease, looks to when the disease itself first arose in the body."

*Id.* at 390, 800 A.2d at 739.

Although recognizing its assets, "simplicity and certainty [and that] it is much easier to establish when a disease was diagnosed or became symptomatic than to establish when cellular changes have progressed into a disease that is not, at the time, detectable," *id.*, we rejected the manifestation approach because "it flatly ignores the distinction made by the Legislature between when an action arises and when it accrues, and is therefore wholly inconsistent with the statute." *Id.* We further pointed out:

> "It is virtually conceded, even by asbestos-action defendants, that diseases such as cancer and asbestosis exist in

---

**10.** *Anchor Packing v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5 (1997), vacated on other grounds sub nom. *Porter Hayden Co. v. Bullinger*, 350 Md. 452, 713 A.2d 962 (1998).

the body before they become symptomatic and before they are capable of clinical diagnosis. The manifestation approach would nonetheless apply the cap even when it is clear that the disease existed, and thus the cause of action based on that disease arose, prior to July 1, 1986."

*Id.*[11] The Court also rejected the *Grimshaw* approach, opining that, despite "some conceptual plausibility," as initially and most recently articulated by the Court of Special Appeals, "it suffers from the fact that it is impossible to apply in any uniform and rational way and necessarily engenders competing expert testimony as to the timing of an event that no one can precisely define." *Id.* at 391, 800 A.2d at 739. We

---

11. This was the second, or, if our holding in *Lloyd E. Mitchell, Inc. v. Maryland Casualty*, 324 Md. 44, 595 A.2d 469 (1991) is considered, the third time, that this Court had rejected the manifestation approach. *Mitchell* did not involve the cap statute, rather we construed a term in an insurance policy, "bodily injury," as used in the policy. We rejected the insurer's manifestation theory, concluding, in light of the medical evidence concerning the development of asbestos-related diseases, "that 'bodily injury' occurs when asbestos is inhaled and retained in the lungs." 324 Md. at 62, 595 A.2d at 478.

The cap issue was presented in *Owens–Illinois v. Armstrong*, 326 Md. 107, 604 A.2d 47, *cert. denied*, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992). In holding the cap inapplicable in that case, we rejected the manifestation theory purely as a matter of statutory construction, noting, in that regard, that the Legislature had cast the statute in terms of when the cause of action "arises," which we construed as meaning "when it comes into existence," not when, for statute of limitations purposes, the cause of action "accrues." *Id.* at 121, 604 A.2d at 54. Then, as reported in *Scribner*,

"Noting that, in a typical tort action, the injury is usually the last of the elements of the tort to occur, we concluded that the action 'arises,' and the statute is thus triggered, when the injury first comes into existence. We pointed out that, when there is a latency period between the exposure or event that ultimately produces the injury and the manifestation or discovery of that injury, the injury will almost necessarily occur before it is, or as a practical matter can be, discovered. Indeed, that is implicit from the 'discovery rule' itself, which is founded on the premise that a period of time may elapse between the point at which an injury occurs and hence a cause of action based on that injury arises and the point at which the injured person reasonably may discover that injury."

*John Crane, Inc. v. Scribner*, 369 Md. 369, 384, 800 A.2d 727, 736 (2002).

concluded that "[i]t is not a workable approach." *Id.* at 391, 800 A.2d at 740.

Although not problem-free, we selected the exposure approach as "the one that presents the fewest significant problems and is most consistent with the statutory language." *Id.* at 390, 800 A.2d at 739. We further explained:

"The exposure approach is consistent with our holdings in *Mitchell* and *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992), and, if carefully delineated, is both theoretically supportable and workable. It rests, initially, on the premise that there is, in fact, an injury. If there is no injury, there is no cause of action. Thus, it need not attempt to address the problem of entirely inconsequential exposures or exposures that produce only pleural plaques or other conditions that, absent more, do not constitute injuries, which seems to have plagued the Court of Special Appeals, for, if that is all that the plaintiff has, no cause of action exists and § 11–108(b)(1) never comes into play. We start, then, with the requisite premise that the plaintiff has established to the satisfaction of the trier of fact that he or she has an injury that was proximately caused by exposure to the defendant's asbestos-containing product. Whether the injury sued upon is cancer or asbestosis, the plaintiff must, at the outset, establish that he or she has that disease and that it was caused, in whole or substantial part, by exposure to the defendant's asbestos-containing product. The question, for purposes of § 11–108(b)(1), is when that injury came into existence."

*Id.* at 391–92, 800 A.2d at 740. We held, *inter alia:* "in actions for personal injury founded on exposure to asbestos, the court, as an initial matter, may look, for purposes of § 11–108(b)(1), to the plaintiff's last exposure to the defendant's asbestos-containing product. If that last exposure undisputedly was *before* July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law."

Fully cognizant of this holding and certainly appreciative of its effect in this case, to render the cap inapplicable to Mr.

Gianotti's personal injury,[12] the petitioner urges a different result for the loss of consortium claim and argues that such a result is required by the nature of the action and by our cases. This is so, it says, because, such a claim being one that "arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party," *Oaks v. Connors,* 339 Md. 24, 33–34, 660 A.2d 423, 428 (1995), "[a] loss of consortium claim does not and cannot 'arise' until the marriage is negatively impacted by one spouse's underlying personal injury." It relies on *Phipps v. General Motors Corp.,* 278 Md. 337, 354, 363 A.2d 955, 964 (1976); *Travelers Indem. Co. v. Cornelsen,* 272 Md. 48, 51, 321 A.2d 149, 150 (1974); *Exxon Corp. v. Schoene,* 67 Md.App. 412, 423, 508 A.2d 142, 148 (1986). In further support of its position that a different trigger applies to a loss of consortium claim, the petitioner submits that the causes of action are separate, citing P. Sandler and J. Archibald, *Pleading Causes of Action* (2nd ed.1998 and Supp.2004) § 3.48 at 319–20; G. Shadoan, *Maryland Tort Damages* (4th ed.1994) at 21–22; R. Bell, *Maryland Civil Jury Instructions and Commentary* § 18.11 at 415 (Michie 1993 and Supp.1996). The petitioner maintains this position, notwithstanding the inextricable intertwining of the loss of consortium claim and the personal injury claim underlying it and the fact that a single cap applies to both.

Although aware that *Grimshaw* considered when a loss of consortium claim arose in the context of the cap statute and a

---

12. The petitioner has not acquiesced in, or accepted, the *Scribner* holding and apparently retains some hope that this Court will yet adopt the manifestation trigger it advocates. It says as much in its brief:

"Owens–Illinois continues to believe that *Scribner* was wrongly decided and asks this Court to reconsider its holding in light of the problems presented here. Even if this Court declines to reconsider *Scribner,* a manifestation standard still should apply to the loss of consortium claim because the damages sought in that claim differ from those sought in the underlying personal injury claim."

Moreover, in the introduction to its argument, the petitioner offers alternative rulings, "if ... the Court ... rejects this opportunity to adopt a clear 'manifestation' test for applying the damages cap statute."

latent disease, holding that it arose at the same time as the predicate personal injury claim, the petitioner maintains that it is neither persuasive nor dispositive: "[b]ecause this Court in *Scribner* overruled *Grimshaw* on the issue of when a personal injury claim arises, it is not clear whether *Grimshaw's* holding as to when the underlying personal injury arises—is still good law." (Petitioner's Brief at 23) Moreover, the petitioner points out that *Grimshaw* cited *Oaks* for the proposition that "loss of consortium is not a separate action" from the predicate personal injury, even though this Court, in *Oaks,* did not disturb the Court of Special Appeals' statement in its opinion, *see Connors v. Oaks,* 100 Md.App. 525, 549, 642 A.2d 245, 257 (1994), that:

> "[a]n action for personal injuries and a claim for loss of consortium are separate causes of action.... The plaintiffs in each action are different-the physically injured spouse has an individual claim in the action for personal injuries, and the husband and wife jointly have a claim for loss of consortium."

It urges, therefore, at most, a reconsideration of *Grimshaw.*

To no one's surprise, the respondents do not agree. They, like the Court of Special Appeals, in *Grimshaw,* 115 Md.App. at 166, 692 A.2d at 21, read *Oak's* holding that, "a loss of consortium claim is derivative of the injured spouse's claim for personal injury, and therefore, a single cap for non-economic damages applies to the whole action," and admonition that, to hold otherwise "would circumvent the Legislature's intent to limit noneconomic damages and avoid double recoveries ...," *Oaks,* supra, 339 Md. at 38, 660 A.2d at 430, as indicating that "[l]oss of consortium is not a separate action." Noting that the personal injury, from which the loss of consortium claim derives, and the harm Mr. Gianotti sustained, with which the loss of consortium is inextricably intertwined, are the result of exposures to asbestos occurring prior to the effective date of the cap statute and that the jury found that injury to pre-exist that date, a finding *Scribner* requires as a matter of law, in any event, although it only became discoverable after that date. The respondents aver, "[i]t is illogical to impose a cap

on non-economic damages in a loss of consortium claim, when the personal injury cause of action is not subject to the statute." (Respondent's Brief at 18).

## B.

In *Deems v. Western Maryland Railway Company*, 247 Md. 95, 115, 231 A.2d 514, 525 (1967), this Court held that, "when either husband or wife claims loss of consortium by reason of physical injuries sustained by the other as the result of the alleged negligence of the defendant, that claim can only be asserted in a joint action for injury to the marital relationship. That action is to be tried at the same time as the individual action of the physically injured spouse." Thus, we extended to a wife a right theretofore only accorded to a husband, thereby creating a new substantive right and delineating a different procedural approach in such actions; however, that action "gave rise to no new cause of action" *Travelers Indem. Co. v. Cornelsen*, 272 Md. 48, 50, 321 A.2d 149, 150 (1974).

We have defined loss of consortium to mean the "loss of society, affection, assistance and conjugal fellowship. It includes the loss or impairment of sexual relations." *Deems*, 247 Md. at 100, 231 A.2d at 517. *See Oaks*, 339 Md. at 33–34, 660 A.2d at 428 ("A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party"). We recognized in *Deems* that "there is, in a continuing marital relationship, an inseparable mutuality of ties and obligations, of pleasures, affection and companionship, which makes the relationship a factual entity." 247 Md. at 108, 231 A.2d at 521. Such interests are so interdependent that injury to them is essentially incapable of separate evaluation as to the husband and wife. *Id.* at 109, 231 A.2d at 522. We also observed, with respect to the effect of an injury to one spouse:

"That both spouses suffer when the marriage relationship is adversely affected by physical injury to either is a fact

evidenced, if not by logic, by human experience since the institution of marriage became a basic part of our mores. If the husband is the one injured, it is not only the wife who is affected by reason of any resultant change of the husband's personality or ability to engage in all the intangible associations which marriage brings; he too suffers the effect of the change, if only in reaction to his wife's unhappiness. Today, at least, it is unquestioned that the desire to have children and the pleasures of sexual intercourse are mutually shared. If the husband's potency is lost or impaired, it is both the man and woman who are affected. If the physical injury is to the wife, she sustains the same kind of loss in the marital relation as he does in the converse situation."

*Id.* at 108–109, 231 A.2d at 522.

There is also, we said, an interdependence between the injury to the marital unit and the action of the defendant that causes that injury: "whether it be the husband or wife who is injured, the negligence of the defendant directly affects the entity through its member who sustains the physical injury. Once the rule is established, the possible loss to the absent member of the entity is a direct and expectable result of the negligence. *See Mahnke v. Moore,* 197 Md. 61, 69, 77 A.2d [923], 927 (1951) and Restatement, Torts § 905, Comments e and f." *Id.* at 114, 231 A.2d at 525. *Oaks* is to like effect. There, we opined, "We believe that damages to a marital relationship are frequently inextricably intertwined with the harm sustained by the injured spouse," explaining:

> "the pain, suffering, and depression that are personal to the injured victim will inevitably affect the relationship with that person's spouse. Whether these injuries are claimed individually, by the marital unit, or by both, however, they constitute noneconomic damages flowing from a single source, the tortious injury to the victim spouse."

339 Md. at 37, 660 A.2d at 430. Thus, "[a] loss of consortium claim is derivative of the injured spouse's claim for personal injury." *Id.* at 38, 660 A.2d at 430; *Okwa v. Harper,* 360 Md. 161, 176, 757 A.2d 118, 126 (2000); *Klein v. Sears, Roebuck*

*and Co.,* 92 Md.App. 477, 493, 608 A.2d 1276, 1284, *cert. denied,* 328 Md. 447, 614 A.2d 973 (1992) ("When a physical injury results to a married person as a result of someone else's tortious conduct, two injuries may arise: (1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to his or her spouse.").

## III.

■ To be sure, the general rule, which the Court of Special Appeals has endorsed, *Gillespie–Linton v. Miles,* 58 Md.App. 484, 496, 473 A.2d 947, 953 (1984), is that a claim for loss of consortium does not lie for an ante-nuptial tort, *Gianotti,* 148 Md.App. at 485, 813 A.2d at 296. *See Marri v. Stamford St. R. Co.,* 84 Conn. 9, 78 A. 582, 582–83 (1911); *Sawyer v. Bailey,* 413 A.2d 165, 166 –167 (Me.1980) *Tribble v. Gregory,* 288 So.2d 13, 16 (Miss.1974); *Consorti v. Owens–Corning Fiberglas Corp.,* 86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301, 1301 (1995); *Anderson v. Eli Lilly & Co.,* 79 N.Y.2d 797, 580 N.Y.S.2d 168, 588 N.E.2d 66, 67 (1991) ("It is by now well settled that a cause of action for loss of consortium does not lie if the alleged tortious conduct and resultant injuries occurred prior to the marriage"); *Domany v. Otis Elevator Company,* 13 Ohio Misc. 161, 369 F.2d 604, 609 (6th Cir.1966), *cert. denied,* 387 U.S. 942, 87 S.Ct. 2073, 18 L.Ed.2d 1327 (1967) (absent the lawful relationship of husband and wife, there can be no recovery for loss of consortium); *Rockstroh v. A.H. Robins Co.,* 602 F.Supp. 1259, 1269 (D.Md.1985) ("It appears to be universally held that, in order to maintain a valid cause of action for loss of consortium, the parties must be married at the time of injury."); *Wagner v. International Harvester Company,* 455 F.Supp. 168, 169 (D.Minn.1978).

One rationale offered for the rule is to prevent a person from marrying a cause of action, *Wagner v. International Harvester Company,* 455 F.Supp. at 169, citing and quoting with approval, *Sartori v. Gradison Auto Bus Co.,* 42 Pa. D. & C.2d 781, 785 (Pa. Comm. Pleas 1967); *Kociemba v. G.D. Searle & Co.,* 683 F.Supp. 1577, 1578 (D.Minn.1988) ("The

purpose of the general rule is to prevent an individual from making a conscious decision to acquire a cause of action by marrying an injured party"). Closely related, another recognizes that one spouse takes the other in his or her then existing state of health and assumes the risk of any deprivation resulting from prior disability. *Furby v. Raymark Industries, Inc.,* 154 Mich.App. 339, 397 N.W.2d 303, 305 (1986); *Rademacher v. Torbensen,* 257 A.D. 91, 13 N.Y.S.2d 124 (1939). As the court in *Chiesa v. Rowe,* 486 F.Supp. 236 (W.D.Mich.1980), applying Michigan substantive law, put it:

> "When a fiancee decides to go forward with the marriage after injury and disability strikes her betrothed she must recognize the extent of assistance and comfort that he will be able to provide and will in turn require. In doing so she waives her rights to another level or form of conjugal fellowship which might have been obtained had she married another."

A third rationale is that, as a matter of social policy, tort liability should be limited. *Stager v. Schneider,* 494 A.2d 1307, 1315 (D.C.App.1985), citing *Tong v. Jocson,* 76 Cal.App.3d 603, 605, 142 Cal.Rptr. 726, 727 (1977).

When the injury and the harm coalesce and manifest at the same time, the cause of action both arises and accrues at approximately the same time, the issue is uncomplicated, even simple, and straightforward; knowledge of the injury will be apparent. That is not the case, however, when the injury is latent and, thus, has not been, and reasonably could not have been, discovered prior to the marriage. The courts that have considered the loss of consortium issue in this latter context have reached different results.

Some courts hold that there can be no cause of action for loss of consortium "where, prior to the marriage, the plaintiff spouse was exposed to, and ingested, a substance that remained in his body and eventually caused illness, but the illness did not occur until after the marriage." *Consorti v. Owens–Corning Fiberglas,* 86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301, 1303 (N.Y.1995). *See Zwicker v. Altamont*

*Emergency Room Physicians Medical Group,* 98 Cal.App.4th 26, 32–34, 118 Cal.Rptr.2d 912, 916–918 (Cal.App.2002); *Fullerton v. Hospital Corp. of America,* 660 So.2d 389, 390 (Fla. App.1995); *Monroe v. Trinity Hospital–Advocate,* 345 Ill. App.3d 896, 281 Ill.Dec. 381, 803 N.E.2d 1002, 1005 (2003); *Doe v. Cherwitz,* 518 N.W.2d 362, 364 (Iowa 1994); *Anderson v. Eli Lilly & Co.,* 79 N.Y.2d 797, 580 N.Y.S.2d 168, 588 N.E.2d 66, 68 (1991). These cases proceed on the basis that the marriage requirement for a loss of consortium claim is absolute, that if the marriage post-dated the injury, there is no consortium claim. The reasoning in *Anderson* is illustrative: "Consortium represents the marital partners' interest in the continuance of the marital relationship as it existed at its inception ..., not upon some guarantee that the marital partners are free of any preexisting latent injuries." 588 N.E.2d at 67–68 (citations and footnote omitted). *See Monroe v. Trinity Hospital–Advocate,* 281 Ill.Dec. 381, 803 N.E.2d at 1005 ("At the time of defendants' alleged negligent conduct of which Kathy complains, there was no marital relationship. Kathy's complaint fails to establish a duty owed to her by defendants."). Therefore, the reasoning continues, the discovery rule cannot save a cause of action that never was. For example, the Iowa Supreme Court, addressing this point, said:

> "The discovery rule has been adopted to ameliorate the harsh results of a statute of limitations when the injury was unknown and basically unknowable. .... The discovery rule anticipates that the claimant had a valid cause of action within the period of limitations, but for some reason, was unaware of it. Here, because there was no marital relation between Jane and John Doe, there was no cause of action within the period of limitations, and the discovery rule cannot create one when none had ever existed during the period of limitations."

*Cherwitz,* 518 N.W.2d at 365 (citations omitted). *See Zwicker,* 98 Cal.App.4th at 34, 118 Cal.Rptr.2d at 918 ("The delayed discovery rule has no place in determining whether a tort claim *ever arose in the first place.*").

Other courts, "conclud[e] that permitting loss of consortium claims [where the injury precedes the marriage but does not manifest until after the marriage] does not thwart the policies of the consortium rule. The spouse is not marrying into a cause of action because, at the time of the marriage, neither spouse knows or could know, through the exercise of reasonable care and diligence, of the latent injury." *Fullerton,* 660 So.2d at 390. *See Stager v. Schneider,* 494 A.2d 1307, 1316 (D.C.App.1985) (discovery during marriage of a pre-marriage failure to disclose test results); *Furby v. Raymark Indus.,* 154 Mich.App. 339, 397 N.W.2d 303, 306 (1986) (asbestos-related illness was not, and could not have been, with reasonable care and diligence, discovered prior to marriage); *Friedman v. Klazmer,* 315 N.J.Super. 467, 718 A.2d 1238, 1240 (1998) ("alleged malpractice was committed before the marriage, but not discovered or reasonably discoverable until after the marriage"); *Cleveland v. Johns–Manville Corp.,* 547 Pa. 402, 690 A.2d 1146, 1149 (1997) ("When the injury involves a hidden or latent disease, such as asbestosis, the injury occurs when the plaintiff discovers, or reasonably should have discovered, the injury."). *See also Aldredge v. Whitney,* 591 So.2d 1201, 1205 (La.App.1991).

*Stager v. Schneider, supra,* 494 A.2d 1307, was the first case to so hold. Its reasoning is illustrative of the others. There, the defendant, a physician did not inform one of the plaintiffs, his patient, Dixie, of a spot or shadow he saw on the X-ray of her lung. *Id.* at 1310. Three months later, Dixie married Patrick Stager, the other plaintiff. *Id.* at 1315. She was diagnosed with lung cancer six months after her marriage. The plaintiffs argued that the claim for loss of consortium was viable because the malpractice cause of action did not accrue until the diagnosis of lung cancer, which occurred after they were married. *Id.* Agreeing, the court explained:

"A spouse's claim for loss of consortium generally could not accrue until the other spouse's cause of action for negligence accrued. We see no reasons of sufficient merit which counsel against viewing the marital status at the time the cause of action accrues as being the relevant time...

[N]either the wrongful conduct nor the fact of injury was known prior to marriage.... We are of the view that the ratio decidendi of cases holding that where the tortious conduct and the fact of injury were known or knowable prior to the marriage, there is no claim for loss of consortium are not persuasive where, as here, the discovery rule controls Mrs. Stager's cause of action for negligence."

*Id.* at 1316 (footnote omitted).

*Green v. A.P.C. (American Pharmaceutical Co.)*, 136 Wash.2d 87, 960 P.2d 912 (1998) also rejected the three common rationales for the marriage requirement, "(1) a person should not be permitted to marry a cause of action; (2) one assumes with a spouse the risk of deprivation of consortium arising from any prior injury; (3) as a matter of policy, tort liability should be limited." *Id.* at 918, citing *Stager*, 494 A.2d at 1315–1316. Submitting that the rationales for the majority rule do not take account of the circumstance in which the injury to the affected spouse is latent and unknown, in the context of that case, the court explained why they did not apply:

"Joshua Green could not have married a lawsuit in 1988 if Kathleen herself did not know then she had a T-shaped uterus that would cause her to have difficult pregnancies. The 'assumption of risk' rationale suffers from the same defect. One cannot assume a risk one does not and cannot know about. .... The third rationale is also weak; it is surely foreseeable that a future spouse or close relative might suffer loss of consortium damages. The class of potential plaintiffs is therefore quite limited, confined to those who might some day be in consortium with an injured party. Thus, allowing such claims does not expose a tortfeasor to unbounded liability."

*Id.* at 918–19 (citation omitted). The court then offered a better reason, opining "[t]he best argument for rejecting the majority rule, however is its fundamental unfairness in the toxic exposure context: loss of consortium damages should be

available for a premarital injury if the injured spouse either does not know or cannot know of the injury." *Id.* at 919.

When the Gianottis married, it is undisputed that Mr. Gianotti's mesothelioma had not been diagnosed. More importantly, it is also undisputed that the parties to the marriage neither knew, nor reasonably could have known, of the injury that formed the basis for the joint claim. We agree with *Green* that it would be fundamentally unfair not to permit the loss of consortium claim in this context and, like the intermediate appellate court, we are persuaded by *Stager* and its progeny, that, where "neither the wrongful conduct nor the fact of injury was known prior to marriage," a cause of action for loss of consortium as to which the underlying injury is a premarital one, accrues when the injury is discovered, or reasonably discoverable. The loss of consortium claim was properly submitted to the jury.

In *Phipps v. General Motors Corporation,* 278 Md. 337, 363 A.2d 955 (1976), the defendant argued, as the petitioner does in this case, that the loss of consortium action is for injury to the marital entity only and is not an action for personal injury. *Id.* at 353, 363 A.2d at 964. Thus, it, like the petitioner *sub judice,* contended that the "joint action for loss of consortium represents a separate cause of action accruing to the marriage entity and is therefore not an aspect of personal injury suffered by the persons who together form the marriage entity." *Id.* at 355, 363 A.2d at 965. This Court rejected those arguments. As to the first, quoting that portion of *Deems,* in which the Court described the effect that an injury to one partner to the marriage has on the other, *id.* at 108–109, 231 A.2d at 522, it concluded that,

> "even though a loss of consortium action was referred to by the Court as an action 'for injury to the marital relationship,' it is clear that the underlying purpose and rationale of the joint action is to compensate the individual persons who form that relationship for the personal injury which they both sustain."

*Phipps,* 278 Md. at 355, 363 A.2d at 965. The latter argument was answered by the pronouncement in *Cornelsen,* 272 Md. at 50, 321 A.2d at 150, that, although the *Deems* case created a new substantive right, it did not create a new cause of action. The *Phipps'* rationale applies equally to this case.

Under the circumstances, and for these reasons, therefore, we agree with the respondents: it is illogical to impose a cap on non-economic damages in a loss of consortium claim where loss of consortium is not a separate action for injury to the marriage entity and the personal injury cause of action from which it derives is not itself subject to the cap statute.

## IV.

■ We turn to a consideration of the court's interpretation of the release the Gianottis signed. As we have seen, that release, in two paragraphs, referred to "future disease," first as a parenthetical expression, referring back to certain enumerated diseases, and then in connection with the petitioner's right to defend "future diseases." The Circuit Court concluded, as a matter of contract interpretation, and the Court of Special Appeals agreed, that the release reserved—did not release—"(1) cancer, (2) mesothelioma, (3) other malignancies or death resulting from cancer, mesothelioma, or other malignancies in the existing law suit . . . resulting or to result from John Gianotti's exposure to asbestos." Both courts rejected the argument that the release's reference, parenthetically, to "future disease," after listing specifically those to which it applied, and its later use of the phrase in the paragraph concerning the petitioner's retained rights, required that the release be interpreted as indicating that Mr. Gianotti's mesothelioma came into being after the release was executed or was released.

■ Releases are contracts. Therefore, they are construed and applied according to the rules of contract law. *Herget v. Herget,* 319 Md. 466, 473, 573 A.2d 798, 801 (1990); *Morgan v. Cohen,* 309 Md. 304, 318, 523 A.2d 1003, 1010 (1987); *Creamer v. Helferstay,* 294 Md. 107, 127, 448 A.2d 332,

342 (1982); *Bernstein v. Kapneck,* 290 Md. 452, 458, 430 A.2d 602 (1981); *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 101, 242 A.2d 512 (1968); *Ralkey v. Minnesota Mining & Mfg. Co.,* 63 Md.App. at 530, 566, 492 A.2d 1358, 1398 (1985). Moreover, it is well settled that "[a] release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation." *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 64, 141 A. 434, 440 (1928). *See Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 531, 204 A.2d 537, 540 (1964); *Pantazes v. Pantazes,* 77 Md.App. 712, 720, 551 A.2d 916, 920 (1989).

Maryland follows the objective law of contract interpretation and construction. *Taylor v. NationsBank, N.A.,* 365 Md. 166, 178–179, 776 A.2d 645, 653 (2001); *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620, 630 (2001); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298, 304 (1996). We explained that rule in *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (citations omitted):

"A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.... As a result, when the contractual language is clear and unambiguous, and in the absence of fraud, duress,

or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract."

■ The cardinal rule of contract interpretation is to effectuate the intentions of the parties. *Kasten Constr. Co., Inc. v. Rod Enterprises, Inc.,* 268 Md. 318, 301 A.2d 12 (1973). In seeking to discern the parties' intention, we construe the contract as a whole, *Bausch & Lomb v. Utica Mutual Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021, 1029 (1993), giving effect to every clause and phrase, so as not to omit an important part of the agreement. *Sagner v. Glenangus Farms Inc.,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

To be sure, the phrase, "future disease," was used in the release and it must have a definite and consistent meaning, which, ordinarily, is its plain and common meaning, *see Bausch & Lomb,* 330 Md. at 779, 625 A.2d at 1029. That phrase must be read in context with the other provisions of the release, however. The entire interpretive focus cannot be on that one phrase. Otherwise, other, significant, provisions of the release will not be given effect.

The "release" is, in truth, both a release and a reservation. The release did release and discharge the petitioner from the claim that the respondent John Gianotti had contracted asbestosis and from "any and all further claims relating to ... the existing lawsuit," which was particularly defined by reference to the court action then in force. The release then provided for the reservation of certain claims, specifically stating that the respondents "do not release" claims for cancer, mesothelioma and or other malignancies or death resulting from cancer, mesothelioma, or other malignancies not alleged in the existing lawsuit. These reserved claims were "hereinafter described as 'future disease.' " The release finally made clear that, as to the claims reserved, the petitioner did not admit or concede liability and was not estopped to contest any alleged future liability therefor.

Like the intermediate appellate court, we reject the premise of the petitioner's argument, that, by using the phrase, "future

disease," in the release, it was agreed that Mr. Gianotti's mesothelioma arose after the date of the release. That premise simply does not follow and, in fact, is undermined by the context in which the phrase is used. Rather than all future diseases, the release addressed only cancers, mesothelioma, or other malignancies resulting from those diseases, which it then sought to consolidate for future reference. "Future disease," as used in the release, therefore, means "cancer, mesothelioma or other malignancies resulting therefrom" it does not address, or even purport to, the question of when any such disease arises. Focusing on that phrase, without, at the same time, recognizing the office it was to play, is to give effect to only a part of the release, thus rendering another part of it, that specifying what the parties reserved for later claims, meaningless.

Nor do we believe that the fact that the Court of Special Appeals ascribed to the petitioner the draftsman's role rendered its decision faulty. It stated the correct test and then simply agreed with an argument, albeit an improper one, which reached the same result, but on a different ground.

## V.

A joint tortfeasor is defined by Maryland Code (1973, 2002 Replacement Volume), § 3–1401(c) of the Courts and Judicial Proceedings Article, as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Section 3–1404 provides:

"A release by the injured person of one joint tort-feasor ... does not discharge the other tort-feasors ... but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid."

In *Bullinger*, one of the defendants, Porter–Hayden, filed a third party claim against Babcock & Wilcox, a manufacturer of boilers insulated with asbestos containing products and, when

Babcock & Wilcox did not file an answer, obtained a judgment by default. 350 Md. at 457, 713 A.2d at 967. The plaintiff in the case against Porter–Hayden settled his case with Babcock & Wilcox prior to the jury returning a verdict against Porter Hayden. *Id.* at 459, 713 A.2d at 965. Although no determination was made by the jury with respect to whether Babcock & Wilcox was a joint tortfeasor, no such issue having been submitted to it, this Court granted certiorari to consider "whether the default judgment on Porter Hayden's third-party claim entered against [Babcock & Wilcox] constituted a determination of liability such that [Babcock & Wilcox] should be considered a joint tortfeasor for purposes of section 3–1404." We held that it was, reasoning:

> "Although no determination as to B & W's liability was made by a judge or a jury, B & W's admission of liability, resulting from the entry of default judgment, is sufficient to establish it as a joint tort-feasor under the [Uniform Contribution Among Tortfeasors] Act."

*Id.* at 472, 713 A.2d at 971.

Finding *Bullinger* to be dispositive, relying on the continuing viability of the default judgment entered in that case, the Court of Special Appeals affirmed the trial judge's reduction of the jury verdict against the petitioner. *Gianotti,* 148 Md.App. at 495–96, 813 A.2d at 302–303. It also gave an alternative ground for its decision. *Id.* at 501–02, 813 A.2d at 306. The intermediate appellate court was convinced that the trial court was not clearly erroneous in finding that there had been a settlement between Babcock & Wilcox and the Gianottis. It pointed out, in that regard, that, "under the [respondents' settlement] agreement, the Gianottis' option to reject the settlement was time limited, *i.e.,* if a settlement was rejected, the client was required to notify B & W at least ninety days prior to their 'post-consolidation trial date.' Here, it was undisputed that the cross-appellants [the respondents] did not notify B & W of their rejection of the settlement figure within ninety days of their 'post-consolidation trial date.' " *Id.* at 502, 813 A.2d at 306.

We agree that the trial court's finding of a settlement was not clearly erroneous and, moreover, that that determination is dispositive. The intermediate appellate court summarized the reasoning of the trial court in finding that the petitioner was due a pro rata reduction of the jury's verdict:

"(1) As the Court of Appeals held in *Bullinger*, in order to find that B & W was a joint tortfeasor, it is unnecessary to have a jury finding that B & W is liable-a default judgment against B & W would suffice; (2) whether or not there was a formal written release is not determinative in deciding whether the defendants were entitled to a pro-rata reduction under section 3–1404 of the Courts and Judicial Proceedings Article; (3) the Gianottis signed releases and obtained payment in 1994 pursuant to the revised agreement with the Angelos law firm; (4) pursuant to the agreement with that law firm, the Gianottis retained the right to receive additional amounts (as spelled out in the revised agreement) should they later discover that Mr. Gianotti suffered from a new disease; (5) the subsequent procedures, to receive the monies agreed upon were a mere formality, inasmuch as there was a settlement as to the dollar amount between the Gianottis and B & W; (6) his finding that there had been a binding settlement was bolstered by the fact that when B & W's attorney said that the case had been settled, plaintiffs' attorneys did not object; and (7) under the circumstances, opposing counsel had a right to rely on the announced settlement."

*Id.* at 500–501, 813 A.2d at 305–06 (footnotes omitted).

JUDGMENT AFFIRMED, WITH COSTS.